# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JEROME MAURICE TEATS #313227,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **NO. 3:19-cv-00841** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **SHAWN PHILLIPS,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Petitioner Jerome Maurice Teats, a pro se state prisoner, filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1) with supporting facts and legal argument. (Doc. Nos. 4, 5). Respondent filed an Answer (Doc. No. 16) and Petitioner filed a Reply. (Doc. No. 23).[1] Petitioner submitted a motion to add fifteen documents to the record, and the Court opted to consider these documents as appropriate when it considers the underling Petition. (Doc. No. 26 at 2). Petitioner also filed motions to appoint counsel (Doc. No. 27), hold an evidentiary hearing (Doc. No. 28), and amend the Petition. (Doc. No. 30). Respondent filed a Response in opposition to the Motion to Amend (Doc. No. 32), and Petitioner filed a Reply. (Doc. No. 34). The Court now considers the underlying Petition[2] and the pending motions. And as explained below, Petitioner is not entitled to relief under Section 2254, the pending motions will be **DENIED**, and this action will be **DISMISSED**.

---

[1] As previously explained, the Court assumes that Petitioner intends for the Court to consider the second of two similar Replies. (*See* Doc. No. 26 at 1 n.1).

[2] One document attached to Petitioner's Amended Motion for Expansion of Record pertains to that motion's timeliness rather than Petitioner's entitlement to habeas relief. (*See* Doc. No. 25-1 at 22 (Exhibit N, medical record)). The Court did not consider this motion untimely, so it is unnecessary to consider this document. The other fourteen documents will be addressed where appropriate below.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner's state criminal case arose from an incident at a Shoney's restaurant in May 2009. *See State v. Teats*, No. M2012-01232-CCA-R3-CD, 2014 WL 98650, at *1 (Tenn. Crim. App. Jan. 10, 2014) ("*Teats I*"). The Tennessee Supreme Court summarized the basic facts of this incident as follows:

> Shortly before six o'clock on the morning of May 18, 2009, Jerome Maurice Teats [("Petitioner")] and Tirrone Akillia Simpkins ("the accomplice") forced their way into the back door of a Shoney's restaurant in Nashville. Armed with guns, they threatened four employees in the kitchen area, forced them to gather in a storage area in the back of the kitchen, and told them to put their heads down and not to move. As the accomplice guarded these employees, [Petitioner] forced the Shoney's manager to take him to the restaurant's money drawer. After taking the money, the intruders fled on foot but were soon apprehended by police.

State v. Teats, 468 S.W.3d 495, 496–97 (Tenn. 2015) ("*Teats II*").

The court appointed Christopher Coats ("appointed counsel") to represent Petitioner. (*See* Doc. No. 14-1 at 10–11). A Davidson County grand jury indicted then Petitioner and the accomplice for "aggravated robbery of the Shoney's manager and four counts of especially aggravated kidnapping of the four Shoney's employees." *Teats II*, 468 S.W.3d at 497. The accomplice's "case was severed before trial, and he later pleaded guilty to all charges." *Id.* at 497 n.1 (citing *Simpkins v. State*, No. M2012-01558-CCA-R3-PC, 2013 WL 775957, at *1 (Tenn. Crim. App. Feb. 28, 2013)).

In January 2010, appointed counsel filed a motion to withdraw after Petitioner's family retained James Todd ("trial counsel") to represent Petitioner. (Doc. No. 14-1 at 11–12). In February 2011, trial counsel filed a motion to suppress statements Petitioner made to police following his apprehension in May 2010. (*Id.* at 24–34). The court held a hearing (Doc. No. 14-4) and denied relief. (Doc. No. 14-1 at 43). As trial approached in late 2011, Petitioner retained

2

Patrick McNally ("co-counsel") to assist trial counsel. *Teats v. State*, No. M2017-00855-CCA-R3-PC, 2019 WL 76643, at *2, 5 (Tenn. Crim. App. Jan. 2, 2019) ("*Teats III*").

The Tennessee Supreme Court summarized the State's evidence at trial as follows:

During a four-day trial from October 31 to November 3, 2011, fourteen witnesses testified for the State. Francisco Carrizosa Perez, a cook and food preparer at Shoney's, testified that on the morning of May 18, 2009, as he opened the restaurant's back door to take out some trash, two men came to the door. One man, later identified through trial testimony as [Petitioner], was wearing a mask and had a pistol. [Petitioner], pointing the pistol at Mr. Perez's head, told Mr. Perez not to look at him and to close his eyes and walk down the hallway leading to the storage area. Mr. Perez followed his orders. Meanwhile, the other intruder, who was not wearing a mask and was later identified as the accomplice, brought the other employees, Dora Delacruz Moreno, Arcelia Ruiz, and Teresa Diane Cline, to the storage area.2 Later the store manager came to the area, where the group sat and waited with their heads down until the intruders left the store.

[FN2] Three of the Shoney's employees testified through an interpreter. Ms. Cline passed away before trial, and the Shoney's manager was unavailable. The jury heard a 911 call, wherein the caller, identified as "Teresa," reported that the restaurant had just been robbed by men with guns. The caller further stated that they had been put into the stockroom and told to "get in the corner."

Arcelia Ruiz, a food preparer at Shoney's, testified that the morning of May 18, 2009, was the worst day of her life. She was in the kitchen preparing food, when she heard Mr. Perez make a noise as if he were scared. She turned around and saw two men enter the back of the restaurant. One of the men, identified at trial as [Petitioner], had his face covered, and both men were carrying guns. She saw [Petitioner] put a gun to Mr. Perez's head while his accomplice pointed a gun at her. The accomplice screamed at Ms. Ruiz not to look at him and asked where the office was located. When she told him the manager was in the office, [Petitioner] led Mr. Perez to the back storage area and then proceeded to the office. The accomplice led Ms. Ruiz to the storage area where Mr. Perez was waiting. Pointing the pistol at Ms. Ruiz and Mr. Perez, the accomplice asked how many people were in the restaurant. As other employees arrived in the kitchen, the accomplice ordered them at gunpoint to the storage area. Continuing to guard the four employees, the accomplice told them "not to move." Eventually, the manager came back and told the employees that the men were going to leave. Ms. Ruiz then heard a voice tell them all to "bow down," and [Petitioner] and his accomplice left.

Dora Delacruz Moreno, a Shoney's employee, testified that on the morning of May 18, 2009, she was in the front of the restaurant preparing the buffet when the intruders entered the restaurant. As she was heading toward the back, she saw [Petitioner] taking the manager toward the restaurant's safe. The man was speaking

3

strongly to the manager, but Ms. Moreno could not understand what he was saying. Ms. Moreno then walked to the kitchen, where the accomplice pointed his gun at her. She could not understand what the man was saying, so she stood there until another employee, Ms. Cline, came and led her to the back with the others. Ms. Moreno's head was down, but she could see the man's feet. He was standing by the back door, blocking their exit, and was waving a gun back and forth. Eventually, the manager arrived and gestured for all of the employees to get down, and the two intruders left. Ms. Moreno estimated that they were in the storage area for a total of about eight minutes, staying there four or five minutes after the men were gone.

Jack Liev, a frequent patron of Shoney's, testified that on May 18, 2009, he arrived at the restaurant a couple of minutes before it opened for business. When he attempted to enter, he noticed that the inner doors of the foyer were locked, which he thought was unusual. He was then met by the manager who frantically explained that the restaurant had just been robbed and asked Mr. Liev to call the police. Mr. Liev called 911 from the parking lot. While waiting for the call to be answered, the manager pointed out one of the suspects, who was walking down the street, wearing a black hoodie. As Mr. Liev talked to the 911 operator, he got into his truck and followed the person, attempting to keep him in his sight. When officers arrived, Mr. Liev directed them to the area he last saw the suspect and returned to Shoney's.

Officer Derek Smith, a patrol officer with the Metropolitan Nashville Police Department ("MNPD"), was the first officer to arrive at the scene. He testified that he received the call around 6:00 A.M. and arrived three or four minutes later. Officer Smith obtained a description of the two suspects from the manager and broadcast the description to other officers in the area. The Shoney's manager then led Officer Smith around the restaurant, describing what had happened. Officer Smith noticed that the manager had a small laceration on the top of his head and that the drawer from the cash register was lying on the floor in the front of the restaurant, along with the register's contents and a black garbage bag.

Also responding to the call and testifying at trial were Officers Patrick Ragan and Paul Sorace, Sergeant Vernon Teague, Detectives Diana McCoy and William Stokes, and Tim Matthews, a crime scene investigator. According to these officers, the accomplice was apprehended in a field near the Bellevue Mall, and [Petitioner] when he emerged from a crawl space beneath a nearby house. While searching for the suspects, police found a white vehicle belonging to [Petitioner] parked across the street from Shoney's. Inside the vehicle, police found [Petitioner's] wallet and a "large black plastic garbage bag" full of loose bills and coins. Police also recovered a loaded .357 magnum revolver, a black pair of pants, a black sweatshirt, and a black hoodie. Lorita Marsh, an expert in latent fingerprint examination, testified that she matched the accomplice's and [Petitioner's] fingerprints to a number of prints collected from [Petitioner's] vehicle.

At the police station, [Petitioner] gave a statement to Detective Stokes and Detective McCoy. An audio recording of this statement was played at trial and a

transcription provided to the jury. In the statement, [Petitioner] claimed that his accomplice approached him a few days before the robbery and convinced him to participate. [Petitioner] told him "yeah, I will go ahead and be involved in on it, but . . . hopefully whatever plan you got[,] I won't be caught." [Petitioner] explained that on the morning of May 18, 2009, he and his accomplice took [Petitioner's] vehicle to a parking lot near the Shoney's restaurant. After parking the vehicle, they walked to the back of the restaurant and then waited, trying to decide what to do. [Petitioner] told his accomplice "whatever you do that's what I'm gonna do." When the back door of the restaurant opened, they rushed in. [Petitioner] was armed with a .357 magnum revolver, and his accomplice was carrying a BB gun. [Petitioner] said that he was the one who "made the guy put . . . the money in the bag." His accomplice "secured" the other employees:

> [H]e started pulling them towards him. And he was, he's like put all the women, like I guess it's a, it's like cooler or—or some area in the back of the store, he secured all of them and pushed them over into the area while I went up front.

After [Petitioner] got the money, they ran out of the restaurant. [Petitioner] threw his gun in some bushes before hiding in a crawl space under a house, where the police eventually found him.

*Teats II*, 468 S.W.3d at 497–99 (footnote omitted).

Petitioner then put on proof, summarized as follows:

[Petitioner] called six witnesses, including several family members and friends of [Petitioner].5 These witnesses testified as to [Petitioner's] emotional problems in the time leading up to the robbery. Dr. Murray Smith, an internist, also testified as to [Petitioner's] mental condition at the time of the robbery.6

[FN5] Among these witnesses were James Teats, Sr., [Petitioner's] father; Juanita Carney, [Petitioner's] sister; Malia Bodruzzaman, [Petitioner's] fiancée; and James Teats, Jr. and Jeffrey Alan Teats, [Petitioner's] brothers.

[FN6] Dr. Smith testified that [Petitioner] was suffering from Graves' disease, or thyroid toxicosis, at the time of the robbery, and opined that this may have affected his ability to understand the situation.

*Id.* at 499 & nn.5–6.

In rebuttal, the State "called Staci Turner, an adult psychiatric nurse practitioner, and Dr. Kimberly Brown, a forensic psychologist. Ms. Turner performed a psychiatric intake of [Petitioner] on June 15, 2009, and testified that he did not appear to be experiencing any

5

hallucinations or showing any signs of psychosis at that time." *Id.* at 499 n.6. Dr. Brown testified as follows:

> She received a request from the trial court in this case on October 1, 2009, to conduct an evaluation of [Petitioner]. She reviewed various records in preparation for her evaluation, and she met with [Petitioner] on November 9, 2009, and December 7, 2009. The first meeting lasted forty minutes, and the second meeting lasted one hour and fifteen minutes.
>
> Dr. Brown testified that psychosis is "a break from reality." She added that, during her interviews with [Petitioner], she did not note any signs of psychosis. Rather, she thought,
>
>> [H]e was very organized in his thinking. He was very logical. [She] had no trouble understanding him, he had no trouble understanding [her]. He was very cooperative and pleasant. It was a very normal conversation. He was able to provide a lot of details for [her] about his life.
>
> Dr. Brown, however, acknowledged that [Petitioner] "described sometimes people calling his name or hearing a knocking on the door and there not being anybody there." She also acknowledged that [Petitioner] was on medication for Grave's disease when she met with him.
>
> As to [Petitioner's] state of mind on the morning of May 18, 2009, Dr. Brown testified, "I guess my opinion was that he wasn't suffering from a mental problem that caused him to not know what he was doing or appreciate the wrongfulness of his actions." She explained that the circumstances of the offenses
>
>> indicated that not only did he know the wrongfulness of his alleged conduct, but he took several steps to try to evade detection or keep from getting caught.
>>
>> So for example: Arriving at a building when it first opens or when it is still somewhat dark, wearing a mask, having an extra set of clothes on to help conceal identity, running from the scene, hiding; those are all behaviors that indicate to me that someone is aware of what they are doing is wrong and they are trying to keep from being caught or detected.
>
> Dr. Brown added that [Petitioner's] statement to the police "strengthen[ed]" her opinion, describing his statement as "[v]ery articulate, intelligent, [an] organized man who had a good ability to communicate in a rational clear manner."

*Teats I*, 2014 WL 98650, at *8–9.

The jury found Petitioner guilty as charged. (Doc. No. 14-1 at 89–93). The court sentenced Petitioner to a total effective sentence of 50 years' imprisonment. (*Id.*). Co-counsel represented Petitioner on appeal (in the context of appellate proceedings, the Court will refer to co-counsel as "appellate counsel"). (*See* Doc. Nos. 14-16, 14-23). The Tennessee Court of Criminal Appeals (TCCA) affirmed, with one judge dissenting. *Teats I*, 2014 WL 98650. The Tennessee Supreme Court granted discretionary review on one issue and affirmed. *Teats II*, 468 S.W.3d 495.

Petitioner filed a pro se post-conviction petition. (Doc. No. 15-1 at 35–65). The court appointed Elaine Heard ("post-conviction counsel") to represent Petitioner. (*Id.* at 66). Post-conviction counsel filed an amended petition (*id.* at 67–70) and Petitioner submitted a pro se supplemental petition. (*Id.* at 71–76). The court held a hearing (Doc. No. 15-2) and denied relief. (Doc. No. 15-1 at 78–85). The TCCA affirmed, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. *Teats III*, 2019 WL 76643, *perm. app. denied* June 20, 2019.

## II. CLAIMS

In the original Petition, Petitioner asserts the following claims:[3]

1.      He received ineffective assistance of counsel from:

    A.      Appointed counsel for refusing to allow him to accept a 12-year plea offer made prior to the indictment (Doc. No. 4 at 1–2; Doc. No. 5 at 1);

    B.      Trial counsel and co-counsel for advising him not to testify (Doc. No. 4 at 3–4);

    C.      Trial counsel and co-counsel for failing to properly advise him regarding a 15-year plea offer (*id.* at 4–5);

    D.      Trial counsel and co-counsel for failing to object to jury instructions (*id.* at 7–8);

---

[3]      In the Answer, Respondent re-numbers Petitioner's claims from the initial filings. (*Compare* Doc. No. 4 at 1–15, *with* Doc. No. 16 at 18–19). Petitioner adopts this re-numbering in the Reply. (*See* Doc. No. 23). Although Petitioner reverts back to his original numbering in his subsequent filings, the Court adopts the numbering in the Answer and Reply.

7

E.    Appointed counsel for failing to properly advise him regarding his competency evaluation (*id.* at 12–13);

F.    Appellate counsel for failing to include the trial court's ruling on the motion to suppress in the record on appeal (*id.* at 5–7);

G.    Appellate counsel for failing to supplement the appeal record with favorable case law (*id.* at 8–9);

H.    Appointed counsel, trial counsel, co-counsel, and appellate counsel for cumulative constitutional deficiencies. (*Id.* at 13).

2.    A change in the law deprived him of due process. (*Id.* at 2–3; Doc. No. 5 at 1–3).

3.    The post-conviction proceedings violated his right to access the courts and equal protection. (Doc. No. 4 at 2–3; Doc. No. 5 at 3–4).

4.    The State withheld exculpatory or impeaching evidence. (Doc. No. 4 at 10–11, 15).

5.    The State used hand signals during the suppression hearing. (*Id.* at 12).

6.    The trial court erred in denying his motion to suppress. (*Id.* at 13–15).

In the Motion to Amend, Petitioner seeks to add three new claims and provide "specificity to a few others." (Doc. No. 30 at 1). This specificity does not alter the substance of the original claims, and the Court will consider the following proposed claims alongside the original claims:[4]

7.    Petitioner received ineffective assistance of counsel from:

A.    Appellate counsel for failing to argue that a change in the law deprived him of due process (Doc. No. 30-2 at 1–8; Doc. No. 30-3 at 2–3);

B.    Trial counsel and co-counsel for failing to obtain certain exculpatory evidence withheld by the State (Doc. No. 30-2 at 18; Doc. No. 30-3 at 16–18);

---

[4]    At this stage in the case, Petitioner may amend the Petition only with the Court's leave or Respondent's written consent. *See* Fed. R. Civ. P. 15(a)(1). Respondent does not consent. (*See* Doc. No. 32). Courts "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). One of the factors considered when "evaluating the interests of justice" is "'futility of amendment.'" *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001) (quoting *Coe v. Bell*, 161 F.3d 320, 341 (6th Cir. 1998)). Here, it would be futile for Petitioner to add the three proposed claims, as explained below.

8

C.     Trial counsel and co-counsel for failing to obtain certain other exculpatory evidence withheld by the State. (Doc. No. 30-2 at 18; Doc. No. 30-3 at 17–18).[5]

### III. LEGAL STANDARD

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA establishes a demanding standard for granting federal relief on claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 U.S. 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it

---

[5]     Respondent contends that, of the three proposed claims, only Claim 7.A is actually new because Petitioner argued Claims 7.B and 7.C through Claim 4 in the original Petition. (Doc. No. 32 at 3–4 & n.1). Although the factual predicate of Claim 4 overlaps with proposed Claims 7.B and 7.C, Claim 4 is presented as a stand-alone *Brady* claim, while Claims 7.B and 7.C are presented as stand-alone ineffective-assistance claims, so the Court will consider all three proposed claims separately.

9

"incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

Review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is "an important 'corollary' to the exhaustion requirement," under which "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct.

2058, 2064 (2017) (citations omitted). A claim also may be "technically exhausted, yet procedurally defaulted" where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). Cause may be established by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). Prejudice requires a showing that the errors at trial worked to a petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (quoting *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991)) (internal quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## IV. ANALYSIS

Petitioner is not entitled to relief under Section 2254 because his claims are not cognizable, without merit, or procedurally defaulted without sufficient cause. The Court will address each category of claims in turn.

### A. Non-Cognizable Claims

The Court can grant a state prisoner's request for habeas relief "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. §

11

2254(a). Therefore, a ground for relief that does not assert a violation of federal law is "outside the scope of federal habeas corpus review." *See Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citations omitted). Two claims will be denied for this reason.

### 1. Claim 1.H—Cumulative Errors of Counsel

Petitioner asserts a claim of ineffective assistance of counsel based on the cumulative errors of his appointed counsel, trial counsel, co-counsel, and appellate counsel. The Sixth Circuit has held that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)). This statement of the law extends to ineffective-assistance claims. *See Pollard v. Parris*, No. 3:20-00017, 2020 WL 2526533, at *15 (M.D. Tenn. May 18, 2020). Accordingly, Claim 1.H is not a viable ground for relief in this proceeding.

### 2. Claim 3—Post-Conviction Proceedings

Petitioner asserts that he was deprived of constitutional rights throughout his post-conviction proceedings. Specifically, Petitioner contends that the state courts did not properly address his pro se filings, including his request to represent himself on appeal. (Doc. No. 4 at 2–3; Doc. No. 5 at 3–4). As explained by the Sixth Circuit, however, "habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief." *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854–55 (6th Cir. 2017) (quoting *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001)). That is "because 'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Cress*, 484 F.3d at 853 (quoting *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)). "[A]ttacks on post-conviction proceedings," on the other hand, "'address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration.'"

12

*Leonard*, 846 F.3d at 855 (quoting *Kirby*, 794 F.2d at 247). That is true even though "'the ultimate goal in' a case alleging post-conviction error 'is release from confinement.'" *Cress*, 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 248). Claim 3, therefore, cannot be an independent ground for federal habeas relief.

In the Reply, Petitioner argues that the state courts' alleged failure to consider his request to represent himself on post-conviction appeal is also "cause" to excuse the procedural default of *other* claims. (*See* Doc. No. 23 at 23). The Court will address this argument below, in its analysis of Petitioner's procedurally defaulted claims.

**B. Adjudicated Claims**

Petitioner exhausted one ineffective-assistance claim and his claim of trial court error. The TCCA's resolution of these claims was not unreasonable.

1. Claim 1.C—Ineffective Assistance Regarding 15-Year Plea Offer

Petitioner asserts that trial counsel and co-counsel were ineffective in failing to properly advise him regarding a 15-year plea offer. According to Petitioner, both trial counsel and co-counsel advised him not to accept the offer because each "felt strongly" that Petitioner would prevail on a certain issue before the TCCA. (Doc. No. 4 at 4). For trial counsel, it was the suppression issue. (*Id.*). And for co-counsel, it was the matter of having Petitioner's four convictions for especially aggravated kidnapping dismissed on due process grounds. (*Id.*). Petitioner alleges that he "asked both attorneys to bombard" the prosecutor "for another offer," but "[t]heir advice and the law led to [Petitioner] not [accepting] the plea." (*Id.*).

Petitioner exhausted this claim on post-conviction appeal by arguing that "trial counsel and co-counsel gave him 'incorrect advice' by promising to obtain a better plea offer and to be

successful on appeal."[6] *Teats III*, 2019 WL 76643, at *6. The TCCA correctly identified the governing standard, set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), before rejecting Petitioner's claim on the merits. *Teats III*, 2019 WL 76643, at *6–7.

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). "[A] court deciding an ineffective assistance claim" need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Id.* at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012).

Further, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below

---

[6]     Petitioner contends that two documents attached to the Amended Motion for Expansion of Record support Claim 1.C. (*See* Doc. No. 25 at 5–6; Doc. No. 25-1 at 12 (Exhibit H, trial counsel letter); *id.* at 23 (Exhibit O, appellate counsel letter)). Because this claim is exhausted, however, the Court's review of it "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011). Therefore, the Court cannot consider these two documents in support of Claim 1.C.

*Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Pinholster*, 563 U.S. at 190).

The TCCA rejected this claim on deficiency grounds, without reaching the issue of prejudice. This approach is consistent with *Strickland*. 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). The TCCA ruled as follows:

> [T]he post-conviction court accredited the testimony of both trial counsel and co-counsel, who stated that they did not promise the Petitioner they would obtain a more favorable plea offer from the State nor did they guarantee success on appeal. Moreover, trial counsel and co-counsel agreed that the Petitioner did not want to plead guilty and instead wanted to go to trial. The record does not preponderate against the post-conviction court's finding that trial counsel and co-counsel were credible witnesses. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). We conclude that the Petitioner failed to establish that trial counsel and co-counsel were deficient.

*Teats III*, 2019 WL 76643, at *7.

This ruling was reasonable. As this excerpt reflects, the state court credited the evidentiary hearing testimony of trial counsel and co-counsel over that of Petitioner. Petitioner testified that "[b]oth counsel 'promised' to obtain a more favorable plea offer, but they never advised the Petitioner of any such offer." *Teats III*, 2019 WL 76643, at *3. But trial counsel (Doc. No. 15-2 at 69) and co-counsel (*id.* at 88) each directly testified that they made no such promise. Petitioner also testified that he "rejected the plea offer based upon trial counsel's advice that the defense would be successful in getting his statement suppressed and the especially aggravated kidnapping charges dismissed, either at trial or on appeal." *Teats III*, 2019 WL 76643, at *2. But, again, trial counsel specifically contradicted Petitioner's testimony by stating that he did not guarantee success

15

on any appeal issues. (Doc. No. 15-2 at 68–69). In the end, both attorneys testified that Petitioner wanted to go to trial. (*Id.* at 63, 75 (trial counsel); *id.* 21, 90 (co-counsel) ("I was very clear that whatever the offer was, [Petitioner] wanted to go to trial.")).

A federal habeas court "may not lightly ignore" a state court's "credibility findings; they are entitled to 'great deference' and 'must be sustained unless [they are] clearly erroneous,' particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)). Petitioner has not demonstrated that the relevant credibility findings were clearly erroneous. Accordingly, it was reasonable for the TCCA to determine that trial counsel and co-counsel were not deficient in advising Petitioner regarding the 15-year plea offer. Claim 1.C is without merit.

2. <u>Claim 6—Motion to Suppress</u>

Petitioner next asserts that the trial court erred in denying his motion to suppress. Petitioner sought suppression of statements made to police in three circumstances: (1) immediately after he emerged from a crawl space; (2) later at the scene; and (3) later at the station. (Doc. No. 4 at 14–15). Petitioner alleges that he was suffering from diminished mental capacity when he made all of these statements. (*Id.*). As to the first statements, he also alleges that he had not received the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). (Doc. No. 4 at 14). As to the second, he alleges that an officer twisted his arm, threatened him, and discussed "a promise of leniency if further information [was] provided." (*Id.*). And as to the third, he alleges that he was not allowed to use the bathroom and refused water before he gave a separate statement on other crimes based on the promise of leniency. (*Id.* at 14–15).

Petitioner exhausted this claim by presenting it to the TCCA on direct appeal.[7] The TCCA thoroughly summarized the suppression motion and hearing testimony before rejecting the claim on the merits. *Teats I*, 2014 WL 98650, at *9–15. The Court provides that summary here before addressing each aspect this claim in turn:

> In February 2011, [Petitioner] filed a motion to suppress his statements to the police. [Petitioner] contended that his initial statement was made without the benefit of *Miranda* warnings and, thus, was inadmissible; that this taint carried over to his subsequent statement made after he was given his *Miranda* warnings; and that his medical condition rendered him unable to validly waive his rights to remain silent and to have a lawyer present. The State resisted the motion, and the trial court held a hearing in March 2011 at which the following proof was adduced:
>
> Dr. Murray Wilton Smith testified that he was the assistant medical director at Cumberland Heights Alcohol and Drug Treatment Center. He had been licensed to practice medicine in Tennessee since 1964. His experience included twenty years of internal medicine and twenty years of "addiction medicine." He performed a "series of evaluations" on [Petitioner] related to his "medical problem called hyperthyroidism." His evaluations included reviewing [Petitioner's] medical records from the TDOC; Dr. Kimberly Brown's report; and a transcript of [Petitioner's] interview with the police. He also met with [Petitioner] on three occasions and spoke with members of [Petitioner's] family and [Petitioner's] fiancé. Dr. Smith then prepared a written report, which was admitted into evidence.
>
> Dr. Smith testified that Grave's disease has varying effects on different individuals. The TDOC records indicated that, in June 2009, [Petitioner] was suffering from "a very high level of thyroxine which is the thyroid hormone that is toxic." Dr. Smith clarified that [Petitioner's] blood test indicated that his level of thyroxine was "about four to five times higher" than normal. [Petitioner's] reported symptoms began about a year prior to June 2009. Dr. Smith first met with [Petitioner] in June 2010, a year after he was put on medication for his condition. Dr. Smith stated that [Petitioner] reacted well to his medication.
>
> Dr. Smith testified that the symptoms [Petitioner] reported experiencing prior to being medicated included "severe anxiety, restlessness, unable to sleep, weight loss, nausea, dizziness, nose bleeds and then later on as it progressed he developed a psychosis with hallucinations and grossly abnormal behaviors." As an example of a "grossly abnormal behavior," Dr. Smith referred to [Petitioner] keeping his urine in bottles in his room. When asked about the reported hallucinations, Dr. Smith explained,

---

[7]    The Tennessee Supreme Court did not address this claim on direct review beyond noting that the TCCA "adequately addressed the issue." *Teats II*, 468 S.W.3d at 498 n.3.

17

He would see people in the other side of the room and then go over to see if they were there and they weren't there. He would see people out in the yard beside the driveway and go to look and there would be nobody there. And he would hear knocking on the door, go to the door to let the person in and there would be no one there.

Dr. Smith also stated that, prior to being medicated, [Petitioner] was unable to think logically "[b]ecause his brain was poisoned, which is what toxic means is the brain was poisoned by the toxic effects of the thyroid hormone that was in excess."

Asked about his opinion of [Petitioner's] mental state on May 18, 2009, Dr. Smith responded, "he had psychosis due to thyrotoxicosis with hallucinations."

On cross-examination, Dr. Smith affirmed that [Petitioner] had been diagnosed with Grave's disease and stated that the "Comprehensive Textbook of Psychiatry says that about 20 percent of Grave's disease have psychosis." Dr. Smith also stated that he reviewed some of [Petitioner's] school records: "In the fall of 2007 and in the spring of 2008 he had excellent grades. Then beginning in the summer of 2008 his grades fell off much lower. So we have documentation that his ability to perform in school was decreased at the same time his symptoms of thyrotoxicosis began."

When asked whether [Petitioner] had reported trying to self-medicate prior to his diagnosis, Dr. Smith responded,

> [Petitioner] had an experience in that as a child. His mother had bipolar illness and was hospitalized multiple times in psychiatric hospitals. As a result of that, when he developed the psychiatric symptoms that were basically for him identical to his mother's illness and he saw how badly she had been treated and talked about, he was afraid to go to a doctor and be diagnosed so he treated himself. He treated himself with something to calm him down because he was so nervous and anxious and agitated.

Dr. Smith clarified that [Petitioner] reported that he took "sleeping pills, tranquilizers and drank some." According to Dr. Smith, these efforts "worsened and would be expected to worsen the symptoms and decrease his mental functioning in terms of his thinking."

Confirming that he understood the legal definitions of intentional and knowing, Dr. Smith testified that, in his opinion, [Petitioner] was not able to form the mental states of intentional or knowing in May 2009 as a result of [Petitioner's] medical illness "[b]ecause his brain function was toxic or poisoned by his mental illness caused by his thyroid disease." Dr. Smith added,

> [Petitioner] could mechanically do things like dress himself or drive the car, but the finer points of reasoning where he would reflect on

18

> the circumstances, the different choices, the consequences of those different choices, that fine reasoning, that higher thinking was not possible because his brain cells were not functioning properly because they were poisoned by the excess thyroid hormone.

Dr. Smith testified that [Petitioner] would not be able "to reasonably resist" pressure from [the accomplice].

Dr. Smith also testified that it was his "professional opinion that [Petitioner's] mental state at the time on the 18th of May, 2009, was such that he could not knowingly understand to waive his *Miranda* rights."

Officer Patrick Ragan of the MNPD testified that he was present at the time [Petitioner] was found hiding under the crawlspace. When [Petitioner] crawled out, Officer Ragan and at least two others were present. The officers "grabbed his hands and placed him in handcuffs and asked him, you know, where—where the gun was for [their] safety and for everybody else's safety." [Petitioner] did not have the gun in his possession, and Officer Ragan did not find it in the crawlspace. Officer Ragan then walked [Petitioner] to his patrol car and placed him inside. Officer Ragan stated that [Petitioner] "was pretty compliant" and "didn't resist any" during their walk to the car. Officer Ragan thought that there "was probably another officer with" them, and he testified that there was "no force used." Officer Ragan then "had a detective come out to go to talk with him there at the scene. [They] were trying to locate the pistol so a kid wouldn't find it." Officer Ragan stated that he witnessed Det. Stokes advise [Petitioner] about his *Miranda* rights.

Officer Ragan subsequently drove [Petitioner] to the police station. During the drive, [Petitioner] did not say anything about his health or about needing medical attention.

On cross-examination, Officer Ragan acknowledged that, when they initially asked [Petitioner] where the gun was, [Petitioner] stated that he did not have it. This interaction occurred before [Petitioner] was given his *Miranda* warnings. Officer Ragan stated that, after Det. Stokes gave [Petitioner] his *Miranda* warnings, [Petitioner] "was very forthcoming and he was—he was very cooperative."

Det. William Stokes testified that, when he arrived on the scene where [Petitioner] was located, the officers already were handcuffing him. As Officer Ragan and Sgt. Teague walked [Petitioner] to the patrol car, Det. Stokes heard Sgt. Teague tell [Petitioner] "to simply cooperate with the detective and tell him everything that he wanted to know." After [Petitioner] was in the car, Det. Stokes asked him his name, to which [Petitioner] replied "Jerome Teats." At that point, 6:30 a.m., Det. Stokes verbally advised [Petitioner] about his *Miranda* rights. Det. Stokes asked [Petitioner] if he understood his rights and [Petitioner] responded affirmatively. [Petitioner] told Det. Stokes that he wanted to talk with him about it. [Petitioner] then gave the detective "pretty detailed information" about what had happened and

19

provided information about his accomplice. [Petitioner] also agreed to provide more detail at the police station.

At the station, Det. Stokes repeated the *Miranda* warnings to [Petitioner]. [Petitioner] indicated that he understood and signed the written rights waiver at 9:30 a.m. [Petitioner] again agreed to speak with the detective. [Petitioner] "never told [Det. Stokes] he did not feel well." [Petitioner] did not ask to go to the hospital. He did not ask for a drink of water or to go to the restroom.

On cross-examination, Det. Stokes acknowledged that Sgt. Teague told [Petitioner] something similar to "better tell the detective everything he needs to know." Det. Stokes denied that this advice was a threat.

[Petitioner] testified that, after he was placed in handcuffs,

> one of the officers grabbed [his] arm in a [sic] unusual way and put force upon [him] to the point where it felt like it was about to be broken. And said, you had better be telling me the truth; you—you better give this officer over here everything—the detective everything he wants to know about what's going on.
>
> And [he] was—[he] never walked over to the police cruiser, [he] was practically drug [sic] over there while [he] was still being subdued in this same manner.

[Petitioner] also testified as follows about what happened with the detective:

> Once I had contact with the detective he immediately started asking me questions about the other person. He asked me questions about the crime and he also made—he made several threats about what I would—like you—you're in very serious trouble. And I said, what do you mean I'm in very serious trouble. He said, I can put a lot of charges on you and I can make your life real hard and I can put you away for life.
>
> And I'm like, what do you mean you can put me away for life. He said, exactly what I just said. And he—he said this to me while I was in the patrol car before he Mirandized me.

[Petitioner] testified that the detective did not "Mirandize" him until after he was questioned. [Petitioner] stated that he answered questions because he was "scared" and "didn't want [the detective] to hurt" him. [Petitioner] testified that the detective's presence standing at the patrol car while [Petitioner] was seated inside was "very aggressive" and that the detective pushed him "at least one time."

20

[Petitioner] testified that, after he arrived at the station, he told an officer that he "needed an ambulance because [his] heart was racing and it would not stop." The officer responded, "[N]o, you're not getting anything until you talk to the detective." [Petitioner's] request to go to the bathroom also was refused.

[Petitioner] stated that, once the detective arrived, and prior to the detective's giving him his *Miranda* rights, the detective

> went over several times what happened during the crime. And if I said something that he didn't like, he would get angry and he would just keep asking me over and over and over and over again. And then it's like he was making me—trying to get me to say things.

> Like I told him that I didn't hit the manager in the head. I said, I didn't hit him. And he said, he said, yes, you did, you did hit the manager. And I said, no, I did not hit the manager.

> He said, well, how—how did he get this big bruise on his head. I said, I don't know what you're talking about. And he kept doing this over and over again.

> And for some reason I just said, well, if you said I did it, then I guess I accidentally did it then.

[Petitioner] affirmed that "all this was done prior to the *Miranda* warnings that were done on the tape."

Asked about his physical and mental health on the day of the offenses, [Petitioner] responded,

> The day that this happened I was—I couldn't function properly. My thoughts were racing and I couldn't answer questions in a way to where I can say that I was fully thinking about them. It was just whatever was popping in my head, that's what I was saying to him. And my heart was beating fast as it had always been. I couldn't—I never could stop sweating. My eyes were always bothering me because—the disease bothers my vision or it bothers my eyes and other things that—like the hallucinations. The hallucinations always occur. They got worse, and worse and worse, even up to this date.

> And that day I can't recall exactly if I had a hallucination but I know I hadn't slept. I hadn't slept.

[Petitioner] added that he had taken Xanax that day.

On cross-examination, [Petitioner] testified that the policeman who accompanied him to the patrol car after he was handcuffed was pulling his arms up and caused him pain. This same officer told him to answer the detective's questions "or I'll break your arm." [Petitioner] reiterated that Det. Stokes then threatened him and pushed him on his shoulder, all before giving [Petitioner] his *Miranda* rights. [Petitioner] admitted to later providing information on other robberies in which [the accomplice] was involved. He did this because Det. Stokes told him that, if he provided such information, "he wouldn't put me away for the rest of my life . . . and also that he would only seek one charge against me and that would be all I got."

Called in rebuttal, Officer Ragan denied pulling [Petitioner's] arms after handcuffing him and denied threatening to break his arm. Also called in rebuttal, Det. Stokes denied pushing [Petitioner], denied threatening to put [Petitioner] "away" for life, and denied telling [Petitioner] that he was going to make his life hard. Det. Stokes added that, during their conversation at the patrol car, "[t]here wasn't any aggressive questioning or any belligerent answering whatsoever. He was very cooperative."

*Teats I*, 2014 WL 98650, at *9–14.

### A. Mental Capacity

Petitioner first argues that his statements should have been suppressed because he was suffering from diminished mental capacity when he made them. As the TCCA explained, "[t]he trial court's [denial of the motion to suppress] indicates that it found [Petitioner's] testimony not credible," and it also "implies that [the trial court] found Dr. Smith's testimony insufficient to demonstrate that [Petitioner] was unable to execute a valid waiver of his constitutional rights prior to making a statement."[8] *Id.* at *14.

The TCCA's mental-capacity ruling was not unreasonable. In assessing whether a waiver of *Miranda* rights "is knowing and intelligent, the relevant question is not whether the criminal

---

[8] The TCCA noted that the record before it "contain[ed] neither findings of fact nor conclusions of law in support of the trial court's ruling." *Teats I*, 2014 WL 98650, at *14. However, as Judge Tipton stated in dissent, the TCCA took "the interesting route of inferring findings from the trial court's ultimate decision, then applying to those findings a presumption of correctness that is given to a trial court's findings." *Id.* at *30. Regardless, the TCCA "explain[ed] its decision on the merits in a reasoned opinion," so this Court, as a federal habeas court reviewing a claim adjudicated on the merits in state court, "simply reviews the specific reasons given by the [TCCA] and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege, but rather whether the suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking any time." *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (internal citation and quotation marks omitted). The Court must consider "the totality of the circumstances surrounding the interrogation" to determine "whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Murphy v. Ohio*, 551 F.3d 485, 511 (6th Cir. 2009) (quoting *Fare v. Michael C.*, 442 U.S. 707, 724 (1979)). "[A] defendant's mental condition, by itself and apart from its relation to official coercion," does not "dispose of the inquiry into" the validity of a *Miranda* waiver. *Id.* at 513 (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). Thus, "absent police coercion," or "any other reasons that [a defendant's] statements were involuntary," a federal habeas court will find reasonable a state court's conclusion that a defendant "voluntarily waived his *Miranda* rights." *Id.* at 514 (citations omitted). But where a defendant's mental "impairment is known to the police," "a lesser quantum of coercion is necessary to call a confession into question." *Id.* (internal citation and quotation marks omitted).

Here, the record, as credited by the TCCA, provides a reasonable basis to conclude that Petitioner validly waived his *Miranda* rights, despite the contrary testimony of Dr. Smith and Petitioner. Detective Stokes testified that, after Petitioner was placed in Officer Ragan's police car at the scene, Stokes administered "verbal *Miranda* rights," Petitioner appeared to understand them, and Petitioner stated that he understood without any qualifications. (Doc. No. 14-4 at 81, 84–85). If Petitioner had not appeared to understand his rights, Stokes testified, Stokes would not have questioned him. (*Id.* at 85). Stokes also testified that Petitioner did not make any statements about feeling unwell in his presence, but that if he did so, Stokes would have "[a]sked him if he needed

23

an ambulance and called an ambulance or if he couldn't accurately describe his medical condition I would have erred on the side of caution and called an ambulance anyway." (*Id.* at 88–89). And Ragan testified that Petitioner did not make any statements about feeling unwell in the patrol car on the way to the station. (*Id.* at 69).

At the station, Detective Stokes again administered *Miranda* warnings to Petitioner, this time using a form. (*Id.* at 86). Stokes testified that Petitioner appeared to read a portion of the form prior to signing it, and that Petitioner indicated that he understood his rights. (*Id.*) The second *Miranda* warning was audio recorded, and a transcript of the exchange confirms that Petitioner was advised of his *Miranda* rights and unequivocally stated that he waived them before answering questions clearly and in detail. (Doc. No. 14-13 at 141–162). Just as with the first *Miranda* warnings, Stokes testified that there was nothing to make him question whether Petitioner's waiver of rights was knowing and voluntary. (Doc. No. 14-4 at 101). If there had been, Stokes testified, Stokes would not have questioned Petitioner. (*Id.*)

The TCCA credited Stokes and Ragan's testimony, which reflects that the police were not aware of any mental impairment Petitioner may have been suffering from at the time he made the statements because he did not appear to be unwell or mention any medical condition. And as explained in more detail below, there was also evidence in the record from which the TCCA could reasonably conclude that police did not coerce Petitioner. In these circumstances, it was not unreasonable for the TCCA to conclude that Petitioner was "mentally capable of waiving [his] *Miranda* rights." *See Finley v. Rogers*, 116 F. App'x 630, 638 (6th Cir. 2004) (affirming state court's ruling that petitioner was "mentally capable of waiving her *Miranda* rights" where the record reflected that "the *Miranda* rights had been read to Petitioner, that she understood them, that she understood the waiver, and that she signed it and answered questions voluntarily").

B. Pre-*Miranda* Statement

Petitioner next argues that the statement he made to police before receiving *Miranda* warnings should have been suppressed. The TCCA rejected this argument:

> The proof, as accredited by the trial court, established that [Petitioner] had two verbal interactions with the police prior to being given his *Miranda* warnings. First, as he was being taken into custody, one of the officers asked [Petitioner] where the gun was. [Petitioner] responded that he did not have it. Second, as [Petitioner] was being escorted to the patrol car, Sgt. Teague told him to cooperate with the detective and to answer the detective's questions.[9]

> As a general rule, the statements a defendant makes in response to custodial interrogation are not admissible at trial unless preceded by the warnings mandated in *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966), and a waiver thereof. *See State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013). "Interrogation 'refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Both the officer's question to [Petitioner] about the location of the gun and Sgt. Teague's subsequent admonition to answer the detective's questions were instances of interrogation conducted while [Petitioner] was in custody and prior to being given his *Miranda* warnings.

> Therefore, we must determine whether [Petitioner's] response to the query about the location of the gun should have been suppressed. We hold that the trial court committed no error in not suppressing [Petitioner's] statement that the gun was not in his possession. The United States Supreme Court has recognized that custodial interrogation necessary to secure an officer's safety or the public's safety need not be preceded by the *Miranda* warnings. *See New York v. Quarles*, 467 U.S. 649, 657–59 (1984). In the instant case, the police knew that a gun had been utilized in the Shoney's incident. Accordingly, the officers taking [Petitioner] into custody were entitled to ask him, prior to administering *Miranda* warnings, about the location of the gun. *See State v. Ricky Ronald Crawford*, No. E2005-02018-CCA-R3-CD, 2007 WL 283141, at *8 (Tenn. Crim. App. Feb. 1, 2007), *perm. app. denied* (Tenn. May 21, 2007). [Petitioner] is entitled to no relief on this basis.

*Teats I*, 2014 WL 98650, at *14–15.

This application of *Quarles* was reasonable. *Quarles* articulates a "public-safety exception to *Miranda*." *Hart v. Steward*, 623 F. App'x 739, 746 (6th Cir. 2015). "*Quarles* requires an officer

---

[9]     Teague's statement will be addressed in the next section, "Coercion at the Scene of the Arrest."

to 'have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it.'" *Hart*, 623 F. App'x at 746 (quoting *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007)). The officers had reason to believe that Petitioner might have a weapon based on a 911 call by a woman named Teresa who reported "We just got robbed" and "they both had guns." *Teats I*, 2014 WL 98650, at *1 n.2. And when Petitioner emerged from the crawl space without a weapon, officers had reason to believe that "someone other than police might gain access to" it. *See Hart*, 623 F. App'x at 746 (quoting *Williams*, 483 F.3d at 428). Accordingly, the TCCA reasonably determined that Petitioner's pre-*Miranda* statement about a gun should not have been suppressed.

## C. Coercion at the Scene of the Arrest

Petitioner contends that his statements should have been suppressed because Sergeant Teague "threatened [him] while forcing him to the patrol car, twisting his arm in an aggressive manner" and saying that "he better tell the detective everything he wants to know." (Doc. No. 4 at 14). He also alleges that he had "a discussion about a promise of leniency" in exchange for further information at the scene of the arrest. (*Id.*). The TCCA rejected this argument:

> We next must determine whether Sgt. Teague's admonition to [Petitioner], made prior to the Defendant receiving his *Miranda* warnings, rendered inadmissible [Petitioner's] later statements, which were made after [Petitioner] received his *Miranda* warnings and after he waived his rights against self-incrimination and to the assistance of a lawyer. That is, did Sgt. Teague's pre-*Miranda* admonition render involuntary [Petitioner's] subsequent waiver of his constitutional rights? *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) (holding that a suspect's waiver of his *Miranda* rights "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception"). We hold that it did not.
>
> This Court looks to "the totality of the circumstances" when determining whether a defendant validly waived his *Miranda* rights. *See State v. Thacker*, 164 S.W.3d 208, appx. 248 (Tenn. 2005) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)). We reiterate that the trial court impliedly accredited Det. Stokes' testimony over [Petitioner's] in determining what happened at the scene of

26

[Petitioner's] apprehension. The record reflects that, although Det. Stokes acknowledged that Sgt. Teague told [Petitioner] that he should tell the detective everything the detective wanted to know, [Petitioner] already had indicated his willingness to cooperate. [Petitioner] did not resist being taken into custody and responded truthfully to Officer Ragan's query about the gun. Det. Stokes stated that [Petitioner] "walked" to the patrol car while being escorted by Officer Ragan and Sgt. Teague and that there was "[n]othing [he] would describe as aggressive" about this encounter. Det. Stokes testified that, after [Petitioner] was in the patrol car and after Det. Stokes advised him of his rights, [Petitioner] "did indicate to me that he understood his rights because I asked him if he understood his rights. And said— he said he wanted to speak with me about it at that point." Det. Stokes denied that Sgt. Teague's remark to [Petitioner] was a "threat."

*Teats I*, 2014 WL 98650, at *15.

This ruling was reasonable. There was ample evidence in the record to reject Petitioner's testimony that an officer twisted his arm. Petitioner, to restate, testified that the officer accompanying him to the patrol car while he was in handcuffs "pull[ed] his arms up and caused him pain" before telling him to "answer the detective's questions 'or I'll break your arm.'" *Id.* at *13. But Officer Ragan testified that he simply "walked [Petitioner] to [Ragan's] car" (Doc. No. 14-4 at 66–67), and that there was "no force used." (*Id.* at 67, 137). Detective Stokes corroborated Ragan's testimony on this point. (*Id.* at 81, 83–84). Ragan testified that there were no threats made to Petitioner at the scene in an effort to learn the location of the accomplice. (*Id.* at 74). And Stokes testified that he and Petitioner had no physical contact after Petitioner was placed in the police car, and that he did not verbally threaten Petitioner at any time—either at the scene or at the station. (*Id.* at 138–140).

Detective Stokes did testify that he heard Sgt. Teague tell Petitioner to "tell the detective everything he wants to know" as Petitioner was being escorted to the police car (*id.* at 91), which was before the first *Miranda* waiver. But Stokes did not consider Teague's statement to be a threat. (*Id.*). And more to the point, in the context of federal habeas review, the Sixth Circuit has held that statements more coercive than Teague's did not undermine the validity of a subsequent *Miranda*

waiver. *See Bachynski v. Stewart*, 813 F.3d 241, 248 (6th Cir. 2015) (quoting *Fleming v. Metrish*, 556 U.S. 520, 522, 527 (6th Cir. 2009)) ("[T]elling a suspect that 'things did not look good for him' and that he should 'do the right thing' did not clearly violate federal law."); *id.* (quoting *United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir. 1997)) (concluding that "an officer's comment that 'things would be easier for [you] if [you] talked' did not contain "a compulsive element suggesting a Fifth Amendment violation"); *id.* at 249 (quoting *McKinney v. Ludwick*, 649 F.3d 484, 489–90 (6th Cir. 2011)) (making the same conclusion for an officer's statement that "you 'could possibly face the death penalty' for your crime").

As to the alleged promise of leniency at the scene of the arrest, Petitioner testified at the suppression hearing that Detective Stokes asked for help and information about other crimes but did not "go into it further until [they] went back to the station." (Doc. No. 14-4 at 109, 126–27). And, again according to Petitioner's suppression hearing testimony, it was not until *after* Petitioner's second *Miranda* waiver and inculpatory statement about the Shoney's incident that Stokes made a promise of leniency in exchange for information about other crimes. (*See id.* at 134–35 ("Q. And [the promise of leniency was] made when in relation to [y]our other conversations with him? A. After the Miranda, the Miranda question.")). In reviewing Petitioner's challenge to the trial court's denial of his motion to suppress, this Court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 180–81. Because the state court record reflected that the alleged promise of leniency occurred after the *Miranda* waiver, it was reasonable to conclude that this alleged promise did not influence Petitioner to waive his *Miranda* rights in the first place. *See Beach v. Moore*, 343 F. App'x 7, 14 (6th Cir. 2009) (explaining that a habeas petitioner "could not have relied upon" an alleged promise of leniency "in making [] statements" to police if the petitioner "gave the statements *before* he

28

received the alleged promise"). Accordingly, the TCCA reasonably rejected Petitioner's argument that his statements should have been suppressed based on coercion at the scene of his arrest.

### D. Coercion at the Station

Finally, Petitioner argues that he experienced additional coercion at the police station by not being allowed to use the bathroom, being refused water, and being given a promise of leniency in exchange for information about other crimes. (Doc. No. 4 at 14–15). By declining to credit Petitioner's suppression hearing testimony on these points, the Court presumes that the TCCA rejected this argument on the merits. *See Teats I*, 2014 WL 98650, at *14 (affirming after noting that "the trial court had before it proof of two different versions of what occurred during and after the police took the Defendant into custody," and that it "accredited the State's version"); *Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

A state court's factual findings are presumptively "correct" as long as "any evidence supports them." *Bachynski*, 813 F.3d at 248 (citing 28 U.S.C. § 2254(e)(1)). Here, both Officer Ragan and Detective Stokes testified that, after Petitioner was taken to the station, Petitioner did not ask for the restroom or water, and that Petitioner would have been allowed to access those things upon request. (Doc. No. 14-4 at 70–71 (Ragan), 89 (Stokes)). And as discussed above, Petitioner's statement could not have been coerced by an alleged promise of leniency that occurred *after* the statement was given.

For all of these reasons, the state court's rejection of Petitioner's motion to suppress was not contrary to or an unreasonable application of Supreme Court precedent, and it was not based on an unreasonable determination of the facts before it. Claim 6 will be denied.

**C. Procedurally Defaulted Claims**

Respondent contends that Petitioner's remaining claims should be rejected, at least in part, because they are procedurally defaulted. (Doc. No. 16 at 24–27 (Claim 1.A); *id.* at 27 (Claim 1.B); *id.* at 28 (Claim 1.D); *id.* at 28–30 (Claim 1.E); *id.* at 30–31 (Claim 1.F); *id.* at 32–33 (Claim 1.G); *id.* at 33–36 (Claim 2); *id.* at 39–41 (Claim 4); *id.* at 42 (Claim 5); Doc. No. 32 at 3–5 (proposed Claim 7.A); *id.* at 3–4 n.3 (proposed Claims 7.B and 7.C, by reference to Claim 4)). The Court agrees that these claims are defaulted, as Petitioner did not present them to the TCCA on direct or post-conviction appeal, and no state court remedies remain. *See* Tenn. Code Ann. § 40-30-102(c) (establishing Tennessee's "one-petition" limitation on post-conviction relief); *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997)) (explaining the three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, none of which apply to these claims).

Petitioner argues that the default of some or all of these claims should be excused for four reasons: (1) the state courts failed to consider his request to represent himself on post-conviction appeal (*see* Doc. No. 23 at 22–24); (2) Tennessee has an "ineffective corrective process" for pro se litigants "to ensure their federal claims are exhausted" (*see id.* at 3); (3) ineffective assistance of counsel (*see id.* at 1; Doc. No. 30-2 at 1–8, 18; Doc. No. 30-3 at 2–3, 16–18); and (4) his *Brady* claim has merit. (*See* Doc. No. 23 at 27). The Court will address each argument in turn.

1. Request to Proceed Pro Se on Post-Conviction Appeal

Petitioner argues that that he was prevented from exhausting defaulted claims because state court clerks and judges thwarted his diligent efforts to represent himself on post-conviction appeal.[10] The two main filings on which Petitioner relies for this argument, discussed in more

---

[10] Despite Petitioner plainly including the factual basis for this argument in the original Petition (*see* Doc. No. 4 at 2–3; Doc. No. 5 at 3–4) and *explicitly* including this argument in the proposed Amended

detail below, are: a May 25, 2017, filing titled "Substitution of Appellate Counsel Due to Ineffective Assistance of Post Conviction Counsel" ("May 25 Filing") (Doc. No. 15-23 at 52, 54–56); and a purportedly "renewed" version of this filing mailed on October 3, 2017, titled "Renewed Motion for Substitution of Counsel or in the Alternative Permission to Proceed Pro Se" ("October 3 Filing").[11]

If the Court accepts Petitioner's argument, this allegation of cause covers each defaulted claim except for proposed Claim 7.A. That is because these claims were included in either the original pro se post-conviction petition ("original pro se petition"), post-conviction counsel's amended petition ("amended petition"), or a pro se "supplemental/amended" petition Petitioner submitted just before the evidentiary hearing ("pro se supplemental petition").[12] And Petitioner contends that, if he had been permitted to represent himself, he would have raised all of these claims on post-conviction appeal, thus avoiding their default. (*See* Doc. No. 23 at 23). Given the apparent course of events in Petitioner's post-conviction proceedings, the Court is sympathetic to

---

Petition accompanying the Motion to Amend (*see* Doc. No. 30-2 at 6–8), Respondent does not acknowledge this argument as an allegation of cause at any point in its briefing.

[11]     The October 3 Filing is in the record filed by Respondent as an exhibit to Petitioner's pro se application for discretionary review. (*See* Doc. No. 15-23 at 58–60). However, the actual document received by the TCCA can be viewed through the TCCA's public database by clicking the "PDF" button next to the following event dated October 6, 2017: "Motion-Substitute Counsel" by Petitioner. *See* https://www.tncourts.gov/PublicCaseHistory/CaseDetails.aspx?id=70060&Number=True, (last visited Mar. 16, 2022). Unlike the document in the record, the publicly available PDF includes attachments. The Court's references to the October 3 Filing are to the PDF retrieved from the database.

[12]     For defaulted claims raised in the original pro se petition, *see* Doc. No. 15-1 at 47–48, 61–62 (Claim 1.A); *id.* at 48, 63–64 (Claim 1.B); *id.* at 47, 58–60 (Claim 1.E); *id.* at 45, 50–54 (Claim 1.F); *id.* at 46–47, 55–57 (Claim 2); *id.* at 47, 57–58 (Claim 4); *id.* at 48, 64–65 (Claim 5). For defaulted claims raised in the amended petition, *see* Doc. No. 15-1 at 68 (Claim 1.B); *id.* (Claim 1.D); *id.* (Claim 1.F); *id.* at 69 (Claim 1.G). For defaulted claims raised in the pro se supplemental petition, *see* Doc. No. 15-1 at 74 (Claim 1.B); *id.* at 72 (Claim 1.F); *id.* at 72–73 (Claim 1.G); *id.* at 74 (Claim 2); *id.* at 73 (Claim 4); *id.* at 75 (Claim 5); *id.* at 75 (proposed Claim 7.B); *id.* (proposed Claim 7.C).

Petitioner's predicament. But as explained below, this allegation of cause is not sufficient to excuse the procedural default of Petitioner's claims.

A. <u>Procedural Background</u>[13]

Petitioner filed the original pro se petition, the court appointed counsel, and post-conviction counsel filed the amended petition. About a week before the evidentiary hearing, Petitioner mailed the court a letter and the pro se supplemental petition. This letter explained that Petitioner was filing the pro se supplemental petition because post-conviction counsel's amended petition "omit[ted] several meritorious claims," and post-conviction counsel was unresponsive to Petitioner's expressed "desire to keep the claims [he] originally raised and add one to two extra issues." (Doc. No. 15-23 at 96). At the evidentiary hearing on April 7, 2017, Petitioner asked the court to consider the pro se supplemental petition. (Doc. No. 15-2 at 37–39). The court did not comment on Petitioner's request at the hearing, and ten days later, the court entered an order denying post-conviction relief that did not mention the pro se supplemental petition. (*See* Doc. No. 15-1 at 78–85).

On April 26, 2017, post-conviction counsel filed a notice of appeal and designation of record. (*Id.* at 86–89). Petitioner then mailed the May 25 Filing to the trial court and the TCCA. After laying out allegations of ineffective assistance by post-conviction counsel, the conclusion of the May 25 Filing includes this request for relief: "Wherefore [Petitioner] respectfully requests this Court to replace [post-conviction counsel] with someone more experience and enthusiasm to fight for his or her clients. In the event that this Court does not replace [post-conviction counsel],

---

[13] Five documents attached to Petitioner's Amended Motion for Expansion of Record provide useful context for this procedural background. (*See* Doc. No. 25 at 6–7; Doc. No. 25-1 at 13–17 (Exhibits I, J, K—court dockets); *id.* at 18–20 (Exhibit L, May 25 Filing); *id.* at 21 (Exhibit M, proof of mailing for Exhibit L)). Two of these documents are included in some form in the record filed by Respondent. (*See* Doc. No. 15-23 at 52, 54–55 (Exhibit L); *id.* at 56 (Exhibit M)). The three other documents are publicly available court dockets. The Court will consider all five documents in its analysis of this allegation of cause.

this Motion serves as proof of [Petitioner] presenting his claims to AEDPA requirements and alerting the Court that [Petitioner] will draft a Pro Se Brief to the Criminal Court of Appeals." (Doc. No. 15-23 at 54 (unchanged from original but for brackets)).

The trial court docket does not list the May 25 Filing as having been filed. (Doc. No. 25-1 at 17). And the TCCA docket lists the following event on May 30: "Notice (Incoming)-Correspondence Received" from Petitioner. (*Id.* at 14, 16). Petitioner maintains that this event reflects the TCCA's receipt of the May 25 Filing, and although this filing cannot be viewed through the TCCA's public database, the Court assumes that Petitioner is correct. However, the TCCA did not acknowledge or rule on the May 25 Filing.

On June 6, 2017, Petitioner mailed the trial court and the TCCA a "Motion to Reconsider and Comply with T.C.A. 40-30-111(b)."[14] (Doc. No. 30-4 at 4–5).[15] This motion requests that "this Court"—apparently meaning the trial court—"[i]ssue another written Order addressing each claim individually by fact and law" or "state its refusal to so do in its written Order." (*Id.* at 5). On June 15, the TCCA denied this motion in the following Order:

> The Appellant is represented by counsel in this appeal. The record has not yet been filed. Currently before the Court is the Appellant's *pro se* "motion to reconsider and comply with T.C.A. 40-30-111(b)." It has long been the rule that an appellant may not be represented by counsel in this Court and simultaneously proceed *pro se. State v. Burkhart*, 541 S.W.2d 365, 371 (Tenn. 1976); *State v. Parsons*, 437 S.W.3d 457, 478 (Tenn. Crim. App. 2011); *State v. Cole*, 629 S.W.2d 915, 917–18 (Tenn. Crim. App. 1981). Moreover, "the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn.

---

[14] Tennessee Code Annotated section 40-30-111(b) states: "Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground."

[15] This document is not in the record filed by Respondent, and it is not viewable through the TCCA's public database. However, Petitioner attached a copy as an exhibit to his Motion to Amend, and the TCCA references this document in a subsequent Order, so the Court assumes that the TCCA received it.

1993). Accordingly, the Appellant's *pro se* motion is hereby denied. All future pleadings shall be filed by counsel.

(Doc. No. 15-13).

On September 5, 2017, post-conviction counsel filed an appeal brief. (Doc. No. 15-17). Petitioner then mailed the October 3 Filing to the TCCA. This filing states: "The Petitioner had a Post Conviction Hearing on 4-07-2017. Shortly after the Petitioner filed a Motion for Substitution of Counsel, (included with this motion). [Petitioner] would like to incorporate the facts and arguments contained in that motion." This is a reference to the May 25 Filing, which is indeed attached to the document. The October 3 Filing also includes this request for relief: "Wherefore, [Petitioner], pro se, respectfully requests relief by replacing counsel or permission to proceed pro se, for any of the reasons presented in this petition." On October 5, the TCCA also received Petitioner's "Motion to Checkout State's Brief and Review Record."[16] This filing again references the May 25 Filing and states that "no judge from any panel ever responded. A subsequent renewed motion has been filed."

On October 10, 2017, the TCCA issued the following per curiam Order with Judge Wedemeyer's name on it::

> [Petitioner] requests the appointment of new counsel on appeal because he is apparently dissatisfied with [post-conviction counsel's] representation. [Petitioner's] motion is hereby denied. The fact that [Petitioner] is not satisfied with counsel's representation is not good cause for the withdrawal of counsel. Indeed, the right to assistance of counsel does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel. *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000). Moreover, "the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993).

---

[16]     This document is not in the record filed by Respondent, but it can be viewed through the TCCA's public database by clicking the "PDF" button next to the following event dated October 5, 2017: "Filing-Miscellaneous" by Petitioner. *See* https://www.tncourts.gov/PublicCaseHistory/CaseDetails.aspx?id= 70060&Number=True, (last visited Mar. 16, 2022).

In the alternative, [Petitioner] requests permission to represent himself on appeal. Our Supreme Court has acknowledged that prisoners may waive the right to counsel and proceed *pro se* in post-conviction proceedings, including any appeals related thereto. *Lovin v. State*, 286 S.W.3d 275, 287–88 (Tenn. 2009). However, the court stated that any request to proceed *pro se* must be asserted in a timely manner, must be clear and unequivocal, and must reflect a knowing and intelligent waiver of the right to counsel. *Id.* [Petitioner] filed the instant motion a month after counsel filed a brief on his behalf. [Petitioner] cannot receive the benefit of counsel and then move to proceed *pro se* only after reviewing the brief filed on his behalf. If [Petitioner] intended to proceed *pro se* on appeal, he should have requested to do so in the beginning. One of the three prerequisites this Court must consider before allowing an appellant to proceed *pro se* is whether the request is asserted in a timely manner. Allowing appellants the opportunity to review briefs filed by counsel before requesting permission to proceed *pro se* would unnecessarily delay final disposition of cases on appeal. <u>Contrary to [Petitioner's] assertion, the record on appeal does not contain a copy of any motion filed in the trial court concerning a request for substitution of counsel or to proceed *pro se* on appeal.</u> [Petitioner's] request to proceed *pro se* is denied. [Petitioner's] *pro se* request to check out the record and the State's brief is also denied.

(Doc. No. 15-23 at 61, 63 (emphasis added)).

Petitioner made several efforts to challenge this Order, all generally arguing that it ignored the May 25 Filing by stating that "the record on appeal does not contain a copy of any motion filed in the trial court concerning a request for substitution of counsel or to proceed pro se on appeal." Petitioner mailed the Tennessee Supreme Court a "Rule 10 Extraordinary Appeal by Permission" (Doc. No. 15-15 at 3–6) and a "Motion for Stay of Proceedings and Disqualification of Judge Robert Wedemeyer." (*Id.* at 1–2). Petitioner also mailed the TCCA a "Notice of Appeal" (Doc. No. 15-23 at 64) and "Brief of Appellant Jerome Teats." (*Id.* at 66–75). Meanwhile, on December 4, 2017, the State filed an appeal brief. (Doc. No. 15-18).

On December 6, 2017, the Tennessee Supreme Court summarily denied Petitioner's Rule 10 Application and Motion to Stay. (Doc. No. 15-16). A state court clerk then returned the brief Petitioner mailed to the TCCA, noting that post-conviction counsel already filed an appeal brief and that Petitioner's Rule 10 Application was denied. (Doc. No. 15-23 at 77).

On January 2, 2019, the TCCA affirmed the denial of post-conviction relief. The next day, post-conviction counsel filed a motion to withdraw, and the TCCA granted it.[17] Petitioner—now recognized as proceeding pro se by the TCCA—filed a Motion to Rehear, including argument that state court clerks mishandled his May 25 Filing and that the October 3 Filings was improperly denied. (*See* Doc. No. 15-23 at 32). The TCCA summarily denied rehearing. (Doc. No. 15-22). Petitioner then filed an application for permission to appeal, again including argument that state court clerks mishandled the May 25 Filing. (*See* Doc. No. 15-23 at 14). The Tennessee Supreme Court summarily denied it. (Doc. No. 15-26).

      B. <u>Analysis</u>

A habeas petitioner can establish cause to excuse procedural default by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (quoting *Carrier*, 477 U.S. at 488). "A factor is external to the defense if it 'cannot fairly be attributed to' the" petitioner. *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)). But a "federal habeas court does not act as an additional state appellate court to review a state court's interpretation of its own law or procedure." *Shahideh v. McKee*, 488 F. App'x 963, 965 (6th Cir. 2012) (quoting *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)).

When a Tennessee court decides whether a prisoner may represent himself on post-conviction appeal, it is deciding a matter of state law. *See Lovin v. State*, 286 S.W.3d 275, 285 (Tenn. 2009) (noting that state statutes and rules "recognize that prisoners have the right of self-

---

[17]     This Motion and Order are not in the record filed by Respondent, but they can be viewed through the TCCA's public database by clicking the "PDF" button next to the events respectively dated January 3 and 8, 2019. *See* https://www.tncourts.gov/PublicCaseHistory/CaseDetails.aspx?id=70060&Number =True, (last visited Mar. 16, 2022).

representation in post-conviction proceedings"). That is because, as the Tennessee Supreme Court explained, "prisoners do not have a constitutionally protected right of self-representation in post-conviction proceedings or other proceedings to collaterally attack their convictions." *Id.* at 284 (citing *Cole v. State*, 798 S.W.2d 261, 263 (Tenn. Crim. App. 1990); *State v. Reeves*, 610 S.W.2d 730, 731 (Tenn. Crim. App. 1980)); *see also McMeans v. Brigano*, 228 F.3d 674, 684 (6th Cir. 2000) (citing *Martinez v. Court of Appeal of California*, 528 U.S. 152, 163 (2000)) ("The [United States] Supreme Court has held that a defendant has no constitutional right to represent himself on direct appeal.").

Here, the TCCA denied Petitioner's request to represent himself on October 10, 2017, and the state courts continued to deny Petitioner relief even after he argued that the October 10 Order ignored a previous request from Petitioner to represent himself. (*See* Doc. No. 15-16 (Tennessee Supreme Court Order denying Rule 10 Application and Motion to Stay); Doc. No. 15-22 (TCCA Order denying Motion to Rehear); Doc. No. 15-26 (Tennessee Supreme Court Order denying Rule 11 Application)). The state courts' resolution of this state-law question controls here. *See Shahideh*, 488 F. App'x at 965. Petitioner cannot use the framework of a "cause" analysis to evade binding precedent that requires a federal habeas court to "accept as valid a state court's interpretation of state law and rules of practice of that state." *See Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003) (citing *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986)); *Lint v. Prelesnik*, 542 F. App'x 472, 480 (6th Cir. 2013) (explaining that a state court's reasoning on a state law question is " largely immaterial," so long as the court actually made a ruling). Therefore, the state courts' denial of Petitioner's request to represent himself on post-conviction appeal does not excuse the default of his claims.

37

Even under state law, moreover, the state courts' resolution was not unreasonable. The Tennessee Supreme Court holds that a request for self-representation in a post-conviction proceeding must be: (1) asserted in a timely manner; (2) clear and unequivocal; and (3) reflective of a knowing and intelligent waiver of the right to counsel. *Lovin*, 286 S.W.3d at 287–88 (citations and footnotes omitted). In the October 3 Filing, Petitioner clearly requested to proceed pro se if the TCCA did not appoint him another attorney. He labeled this filing a "Renewed Motion," as if he had made the same exact request in the May 25 Filing. Indeed, in later state-court filings and in this Court, Petitioner characterizes the May 25 Filing as including a clear request to proceed pro se on post-conviction appeal. (*See* Doc. No. 15-15 at 4 (Rule 10 Application); Doc. No. 15-23 at 31–32 (Motion to Rehear); Doc. No. 4 at 3 (original Petition); Doc. No. 23 at 22 (Reply)). But the May 25 Filing was not so clear; rather than request to proceed pro se, this filing merely "alert[ed]" the TCCA that Petitioner "w[ould] draft a Pro Se brief" if the TCCA did not appoint him another attorney. (*See* Doc. No. 15-23 at 54). Particularly given the Tennessee Supreme Court's instruction to "indulge every presumption against waiver of the right to counsel," *Lovin*, 286 S.W.3d at 287 n.15 (citations omitted), it is not unreasonable to treat Petitioner announcing an intention to file a pro se brief—as occurred in the May 25 Filing—differently than a request to proceed pro se altogether.

Arguing otherwise, Petitioner points to *Clemmons v. Delo*, 124 F.3d 944 (8th Cir. 1997). There, Petitioner contends, the Eighth Circuit found that a pro se habeas petitioner in "a near[ly] identical situation" demonstrated cause to obtain review of claims defaulted in state post-conviction proceedings. (*See* Doc. No. 23 at 24). The question in *Clemmons*, however, was "not whether there was cause to excuse a procedural default, but whether there was a default in the first place." *Clemmons*, 124 F.3d at 948. And the Eighth Circuit held that a claim raised in a pro se

supplemental brief was not defaulted because it was fairly presented to the state courts. *See id.* at 948–49. Here, by contrast, there is no serious dispute that Petitioner's remaining claims are defaulted. Moreover, *Clemmons* concerned post-conviction proceedings in Missouri, and "[n]o rule of court or reported Missouri case . . . specifie[d] the circumstances under which Missouri appellate courts allow[ed] pro se briefs." *Wallace v. Sexton*, 570 F. App'x 443, 452 (6th Cir. 2014) (quoting *Clemmons*, 124 F.3d at 948 n.3). Indeed, "the Eighth Circuit noted that had there been a clearly established procedural rule, it may have ruled differently." *Hill v. Carlton*, 399 F. App'x 38, 46 (6th Cir. 2010) (citing *Clemmons*, 124 F.3d at 948 n.3). But "Tennessee courts follow the rule that petitioners may not file pro se briefs while they are represented by counsel." *Wallace*, 570 F. App'x at 452. Accordingly, *Clemmons* does not support Petitioner's claim of cause. *See McMeans*, 228 F.3d at 684 (rejecting habeas petitioner's argument that a state court's "decision to strike his pro se brief constitutes 'cause' to excuse his procedural default").

In sum, this Court must defer to a state court's resolution of state-law questions, including the question of whether Petitioner could proceed pro se on post-conviction appeal. The Court understands Petitioner's frustration that no state court directly addressed the May 25 Filing. But the May 25 Filing, unlike the October 3 Filing, did not include a clear and unequivocal request to proceed pro se. Therefore, even if this Court could review the TCCA's October 10 Order squarely rejecting Petitioner's request to proceed pro se, that determination was not unreasonable. For all these reasons, Petitioner cannot establish cause to excuse the default of his claims based on the state courts' alleged mishandling of his request to proceed pro se on post-conviction appeal. *See Turner v. Johnson*, No. 3:15-CV-00114, 2018 WL 1514090, at *7 (E.D. Tenn. Mar. 27, 2018) (finding that a habeas petitioner in Tennessee failed to demonstrate cause where the TCCA ultimately failed to consider his "motion to remove counsel and file a pro se brief").

2. Ineffective Corrective Process

In a separate allegation of cause, Petitioner argues that Tennessee has an "ineffective corrective process" for pro se litigants "to ensure their federal claims are exhausted." (*See* Doc. No. 23 at 3). This argument is based on the same circumstances addressed above, and it fails for the same reasons. Moreover, this argument seemingly invokes a statutory exception to the exhaustion requirement, so it is misplaced in the procedural default context. That is, a habeas petitioner is not required to exhaust state court remedies if "there is an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B)(i). "Exhaustion and procedural default, however, are distinct concepts." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Where, as here, "state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Id.* (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). Therefore, Petitioner cannot rely on an exhaustion exception as cause to excuse his default. *See Smith v. Warden, Toledo Corr. Inst.*, 780 F. App'x 208, 225 n.2 (6th Cir. 2019) (rejecting habeas petitioner's request to excuse procedural default based on statutory exhaustion exceptions).

3. Ineffective Assistance of Counsel

Petitioner's assertions of ineffective assistance by trial counsel, co-counsel, and appellate counsel may serve as allegations of cause to excuse procedural default. The Court will address this group of attorneys before turning to Petitioner's allegation of ineffective assistance by post-conviction counsel.

A. Trial Counsel, Co-Counsel, and Appellate Counsel

"Ineffective assistance of counsel can constitute cause for a procedural default." *Hodges*, 727 F.3d at 530 (citing *Carrier*, 477 U.S. at 492). Through proposed Claim 7.A, Petitioner asserts

that appellate counsel was ineffective for failing to raise Claim 2, in that he did not argue that a change in the law deprived Petitioner of due process. And through proposed Claims 7.B and 7.C, Petitioner asserts that trial counsel and co-counsel were ineffective for failing to obtain exculpatory evidence from the State. Liberally construed, the Court may consider this as an allegation of cause to excuse the default of Claim 4, Petitioner's *Brady* claim.

"However, 'an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted.'" *Hodges*, 727 F.3d at 530 (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)). That is the case here, as Petitioner did not present the assertions of ineffective assistance underlying proposed Claims 7.A, 7.B, and 7.C to the TCCA on post-conviction appeal.

To extend the concept of "cause" one step further, a habeas petitioner may demonstrate cause for a procedurally defaulted ineffective-assistance claim that is, itself, an allegation of cause for another claim. *Edwards v. MacLaren*, No. 17-2455, 2018 WL 6436389, at *3 (6th Cir. July 12, 2018) (quoting *Edwards*, 529 U.S. at 453) ("When 'an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim [is] itself . . . procedurally defaulted[,] . . . that procedural default may . . . *itself* be excused if the prisoner can satisfy the cause-and-prejudice standard with respect to *that* claim.'"). In other words, "the procedural default of [a] cause ground [can] itself be excused." *See Williams v. Lazaroff*, 648 F. App'x 548, 554 (6th Cir. 2016). Petitioner may argue that the default of his cause grounds should be excused for the reason addressed above—the state courts' alleged mishandling of his request to proceed pro se on post-conviction appeal. Because this argument is unavailing, Petitioner cannot rely on it as a second-layer allegation of cause. And as explained below, Petitioner also cannot rely on post-conviction counsel's asserted ineffectiveness to excuse any default. Accordingly, the asserted ineffectiveness

of trial counsel, co-counsel, and appellate counsel does not excuse the procedural default of Petitioner's claims.

## B. <u>Post-Conviction Counsel</u>

In *Martinez v. Ryan*, the United States Supreme Court announced a "narrow exception" to the "general rule" that ineffective assistance of post-conviction counsel cannot "qualify as cause to excuse a procedural default." *Davila*, 137 S. Ct. at 2062 (discussing *Martinez v. Ryan*, 566 U.S. 1 (2012)). In some circumstances, therefore, the ineffective assistance of post-conviction counsel may be used to establish the "cause" necessary "to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 566 U.S. at 17. But for the following reasons, Petitioner cannot rely on *Martinez* for that purpose here.

### i. <u>Ineligible Under *Martinez* Due to Type of Underlying Claim</u>

*Martinez* can serve as "cause to overcome the default of a single claim—ineffective assistance of trial counsel." *Davila*, 137 S. Ct. at 2062–63 (discussing *Martinez*, 566 U.S. 1, and *Trevino*, 569 U.S. 413). Therefore, the default of Petitioner's claims of appellate ineffectiveness—Claim 1.F, Claim 1.G, and proposed Claim 7.A—cannot be excused under *Martinez*. *See Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 832 (6th Cir. 2019) (explaining that *Davila* explicitly "declined to expand *Martinez* to procedurally defaulted claims of ineffective assistance of appellate counsel"). The same is true of Claims 2, 4, and 5, asserting a due process violations and prosecutorial misconduct. *See Abdur'Rahman v. Carpenter*, 805 F.3d 710, 714 (6th Cir. 2015) (explaining that *Martinez* does not apply to "claims of *Brady* violations and prosecutorial misconduct").

There is one more potential pathway to obtaining review of Claim 4, be addressed below. But there is no remaining pathway to excuse the default of Claim 1.F,[18] Claim 1.G, Claim 2, Claim 5, or proposed Claim 7.A.[19] Accordingly, these six claims are procedurally defaulted without cause, and they are not subject to further review.

## ii. Ineligible Under *Martinez* Due to Default on Appeal

*Martinez* "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." 566 U.S. at 16. Accordingly, ineffective assistance of post-conviction counsel cannot excuse the default of a claim rejected by the post-conviction court and not raised on appeal. *See West v. Carpenter*, 790 F.3d 693, 699 (6th Cir. 2015) ("[A]ttorney error at state post-conviction appellate proceedings cannot excuse procedural default."). Three remaining claims are subject to dismissal for this reason.

In Claims 1.B and 1.D, respectively, Petitioner asserts that trial counsel and co-counsel were ineffective for advising him not to testify and failing to object to jury instructions. Petitioner raised Claim 1.B in the original pro se petition, and post-conviction counsel raised both Claim 1.B

---

[18] One document attached to Petitioner's Amended Motion for Expansion of Record relates to Claim 1.F, which asserts that appellate counsel failed to include the trial court's ruling on the motion to suppress in the record on appeal. (*See* Doc. No. 25 at 1–2; Doc. No. 25-1 at 1 (Exhibit A, appellate counsel email)). This document has no bearing on whether Claim 1.F is procedurally defaulted, or whether that default is excused, so the Court will not consider it. *See Steele v. Jenkins*, No. 17-4171, 2018 WL 2144073, at *4 (6th Cir. Mar. 5, 2018) (holding that a district court properly denied a habeas petitioner's motion to expand the record to include documents with "no bearing on the determination that [petitioner] procedurally defaulted all of his claims or that the procedural bar has not been excused").

[19] Two documents attached to Petitioner's Amended Motion for Expansion of Record relate to Claim 2 and proposed Claim 7.A, which assert that a change in law deprived Petitioner of due process, and that appellate counsel was ineffective for failing to raise this issue on direct appeal. (*See* Doc. No. 25 at 4–6; Doc. No. 30-2 at 3–4; Doc. No. 25-1 at 12 (Exhibit H, trial counsel letter); *id.* at 23 (Exhibit O, appellate counsel letter)). These documents have no bearing on whether Claim 2 and proposed Claim 7.A are procedurally defaulted, or whether that default is excused, so the Court will not consider them. *See Steele*, No. 17-4171, 2018 WL 2144073, at *4.

43

and Claim 1.D in the amended petition. (Doc. No. 15-1 at 48, 63–64 (original pro se petition); *id.* at 68 (amended petition)). The court clearly denied both claims in its written order. (*Id.* at 84). And Petitioner did not raise these claims on post-conviction appeal. Therefore, Petitioner cannot rely on post-conviction counsel's ineffectiveness to excuse the default of Claims 1.B and 1.D, and they are not subject to further review.

Petitioner also defaulted Claim 1.A on post-conviction appeal, although the post-conviction court's ruling on this claim is less clear. This claim asserts that appointed counsel was ineffective for refusing to allow Petitioner to accept a 12-year plea offer made prior to the indictment. Petitioner raised this claim in the original pro se petition (*id.* at 47–48, 61–62), but post-conviction counsel did not include it in the amended petition. Petitioner testified on this subject at the evidentiary hearing. *Teats III*, 2019 WL 76643, at *3 (summarizing testimony). At the end of the hearing, the State began to question whether "[an] abundance of caution" would require appointed counsel to testify. (Doc. No. 15-2 at 96). The court responded, "I mean, I think it's pretty clear he wanted a trial, but if you think you need [appointed counsel] then." (*Id.*). The State remarked, "Well, no, the State is -- that's all the State's proof." (*Id.*). In its written order, the court did not specifically mention this claim, but it acknowledged Petitioner's original pro se petition and summarized his evidentiary hearing testimony in support of this claim before denying post-conviction relief. (Doc. No. 15-1 at 78–85). Given the court's comment at the end of the evidentiary hearing, and its summary of Petitioner's testimony in support of this claim in its written order, this Court infers that the post-conviction court rejected Claim 1.A on the merits when it denied relief. *See Teats III*, 2019 WL 76643, at *2 (including Claim 1.A within its summary of the claims raised in the original post-conviction petition). And Petitioner did not preserve this claim

44

on appeal. Claim 1.A's default is therefore ineligible to be excused under *Martinez*, and it is not subject to further review.

### iii. Insubstantial Under *Martinez*

The post-conviction court did not specifically address the merits of Claim 1.E, proposed Claim 7.B, or proposed Claim 7.C, so *Martinez* may, in theory, provide a pathway to demonstrating cause.[20] To excuse default under *Martinez*, several requirements must be met, including that the underlying claim is "substantial." *Abdur'Rahman*, 805 F.3d at 713 (quoting *Martinez*, 566 U.S. at 17). "A substantial claim is one that has some merit and is debatable among jurists of reason." *Id.* (citing *Martinez*, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16). These three claims are not substantial.

In Claim 1.E, Petitioner asserts that appointed counsel was ineffective for failing to properly advise him before his competency evaluation by Dr. Kimberly Brown. (Doc. No. 4 at 12–13). As background, on October 1, 2009, the trial court ordered Petitioner to be evaluated "to determine his competency to stand trial and his condition at the time of the offense." (Doc. No. 14-1 at 44). Dr. Brown "reviewed various records in preparation for her evaluation, and she met with [Petitioner] on November 9, 2009, and December 7, 2009. The first meeting lasted forty minutes, and the second meeting lasted one hour and fifteen minutes." *Teats I*, 2014 WL 98650,

---

[20]    Respondent argues that Petitioner defaulted Claim 1.E on post-conviction appeal because he raised it in the original pro so petition. (*See* Doc. No. 16 at 29). But post-conviction counsel did not include this claim in the amended petition, Petitioner did not mention it at the evidentiary hearing, and the court did not reference it in the written order denying relief. Petitioner also included proposed Claims 7.B and 7.C in the pro se supplemental petition, but the state courts did not recognize this as an operative pleading. The Court therefore assumes that these three claims are not categorically excluded from *Martinez*'s reach because the state court did not review them in Petitioner's initial-review collateral proceedings. *See Davila*, 137 S. Ct. at 2067 (citing *Martinez*, 566 U.S. at 10, 12) (explaining that *Martinez*'s "chief concern" is to "ensure that meritorious claims of [ineffective assistance of trial counsel] receive review by at least one state or federal court").

45

at *8. Dr. Brown found that Petitioner was "competent to stand trial" and that "an insanity defense could not be supported." (Doc. No. 14-1 at 44). Appointed counsel withdrew shortly thereafter, when Petitioner retained trial counsel. A few months before trial, the court entered an order stating that Petitioner intended to "raise a mental defense" at trial, so "[i]nformation obtained during" Dr. Brown's evaluation had "become relevant," and all information related to this evaluation was to be released to the State. (*Id.*). At trial, after Petitioner put on proof of his compromised emotional, physical, and mental state in the time leading up to and during the commission of the offenses, the State called Dr. Brown in rebuttal.

Here, Petitioner argues that appointed counsel was deficient for failing to warn him "that statements he made to" Dr. Brown "could be used against him in his trial," and that he suffered prejudice because "several statements" Petitioner "made were presented to the jury." (Doc. No. 4 at 12–13). However, Tennessee courts have held that defense counsel has an obligation to raise the issue of competency before trial "if counsel had reasonable cause" to so do. *Plummer v. State*, No. M1999-01406-CCA-R3PC, 2000 WL 1606589, at *2 (Tenn. Crim. App. Oct. 27, 2000) (citing *Wilcoxson v. State*, 22 S.W.3d 289, 306 (Tenn. Crim. App. 1999)). Petitioner does not argue that it was improper to conduct the evaluation, and his evidentiary hearing testimony supports the notion that there was reasonable cause for it. (*See* Doc. No. 15-2 at 46 (testifying that, around the time of his competency evaluation, he was "on medication" and "bad off")). As Respondent argues, the Court cannot consider appointed counsel deficient for "allowing Petitioner to honestly engage with a court ordered psychiatric evaluation." (*See* Doc. No. 16 at 30).

Moreover, Petitioner does not identify the specific statements he made to Dr. Brown at the evaluation that ultimately prejudiced him at trial. Perhaps that is because Dr. Brown's trial

testimony on this subject was rather limited. As to specific statements at the evaluation, Dr. Brown testified only that Petitioner

> described some religious experiences. He talked about having a gift of discernment. And he talked about having dreams and visions. F[or] example, he told me about a dream that he had where Satan came to him in his dream.
>
> He also mentioned that he thought he h[]ad an ability to connect with the spirit world that he didn't think other people had. He considered that a gift. And he described sometimes people calling his name or hearing a knocking on the door and there not being anybody there.

(Doc. No. 14-8 at 194). Given all the other evidence presented at trial, there is not a reasonable probability that the outcome would have been different if Dr. Brown did not relay these statements. Accordingly, Claim 1.E is insubstantial.

Proposed Claims 7.B and 7.C assert that trial counsel and co-counsel were ineffective for failing to obtain exculpatory evidence withheld by the State. The evidence at issue in these proposed claims is the same evidence that underlies Petitioner's stand-alone *Brady* claim, addressed below. And as explained below, Petitioner cannot excuse the default of his *Brady* claim, in part, because Petitioner has not demonstrated that any suppression resulted in prejudice. *See Brooks v. Tennessee*, 626 F.3d 878, 891 (6th Cir. 2010) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)) ("[A] petitioner who proves a *Brady* violation demonstrates cause and prejudice to excuse procedural default of the *Brady* claim."); *id.* at 890 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)) (explaining that the third element of a *Brady* claim is that "prejudice must have ensued"). "[I]t is well settled that 'the test for prejudice under *Brady* and *Strickland* is the same.'" *Montgomery v. Bobby*, 654 F.3d 668, 679 n.4 (6th Cir. 2011) (en banc) (collecting cases). Therefore, for the same reasons that Petitioner fails to demonstrate prejudice under *Brady*, he also fails to demonstrate prejudice for these two proposed claims.

47

Petitioner also fails to demonstrate deficiency for these proposed claims. Proposed Claim 7.B asserts that trial counsel and co-counsel were ineffective for failing to obtain "U-visa information" for the three especially aggravated kidnapping victims who testified at trial: Francisco Carrizosa Perez, Arcelia Ruiz, and Dora Delacruz Moreno (collectively, the "victims"). (Doc. No. 30-3 at 16–17). A U-visa is available to "noncitizen victims of serious crimes who cooperate with law enforcement and to the noncitizens' qualifying family members." *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 436 (6th Cir. 2022) (citations omitted). "[A]n application for a U-visa must be accompanied by a certification from a law enforcement officer or investigating official that the alien 'has been helpful . . . in the investigation or prosecution of criminal activity.'" *Tapia v. Gonzales*, 192 F. App'x 436, 440 (6th Cir. 2006) (internal quotation marks omitted). Trial counsel and co-counsel filed a "Motion for Exculpatory Evidence" specifically requesting immigration information for the victims, as well as any immigration-related agreement or understanding the victims had with the State. (Doc. No. 14-1 at 46). At a subsequent hearing, the prosecutor stated that she had "the U-Visa information that was filled out by ou[r] office," that she would provide trial counsel copies of that information, and that the State had no agreement or understanding with the victims. (Doc. No. 14-3 at 3). The court therefore considered the State to have "complied with" the Motion. (*Id.* at 4).

Petitioner contends that, despite the prosecutor's statement at the hearing, the State did not actually provide any U-visa information. (*See* Doc. No. 30-3 at 16). Even assuming that is true, however, the purpose of requesting the victims' immigration information was to obtain impeachment material for trial. At the hearing, trial counsel stated that he had "recently been informed that the three . . . alleged victims were in this country illegally at the time" of the offenses, and that he intended to impeach the victims' credibility on that basis at trial. (Doc. No. 14-3 at 3).

48

Trial counsel also stated that he was going to "subpoena the person from Shoney's" to check what the victims reported about their immigration status on their job applications. (*Id.* at 4). The court questioned whether the victims' immigration status was relevant, but it deferred ruling on the issue until trial counsel received the subpoenaed information. (*See id.* at 3–5). A few days later, the State filed a motion in limine requesting that the court instruct Petitioner's counsel "not to ask questions . . . related to citizenship status" on relevancy grounds. (Doc. No. 14-1 at 55).

On the first day of trial, before jury selection, trial counsel mentioned that "the records from Shoney's aren't here," but that he still intended to impeach the victims' credibility based on their immigration status if the records reflected that "they were here illegally." (Doc. No. 14-5 at 7). The court left the matter under advisement at that time. (*Id.*). The next day, before the State called the victims to testify, trial counsel again raised the issue of impeaching their credibility based on citizenship status. (Doc. No. 14-6 at 42). The State represented that, rather than send the subpoenaed records to the court, Shoney's had sent them to the State by e-mail. (*Id.* at 41–43). The court took a recess to allow trial counsel and co-counsel an opportunity to review the records. (*Id.* at 42–43). Upon return, trial counsel stated on the record that Shoney's counsel was present and had informed trial counsel that "they had . . . whatever the form is indicating that all the witnesses that are going to testify were here legally at the time, so that issue is now moot." (*Id.* at 43–44).

As this course of proceedings reflects, trial counsel and co-counsel diligently pursued information regarding the victims' citizenship status with the intent to impeach their credibility at trial. The trial court had not decided whether to permit this line of questioning when, before the victims testified, Shoney's counsel arrived with records to verify the victims' citizenship status. Trial counsel and co-counsel had an opportunity to review these records before conceding that the issue was moot. Trial counsel and co-counsel's investigation of the victims' citizenship status at

49

the time of the offenses was therefore reasonable. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Proposed Claim 7.C asserts that trial counsel and co-counsel were ineffective for failing to obtain a recorded conversation between Petitioner and MNPD Detective McCoy at the police station. (Doc. No. 30-3 at 17). Unlike the U-visa information, however, Petitioner does not point to anything in the record (aside from his own suppression hearing testimony) suggesting that this evidence ever existed, and counsel cannot be deficient for failing to obtain evidence that did not exist. *See Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) (citing *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998)) ("[M]erely conclusory allegations of ineffective assistance . . . are insufficient to state a constitutional claim.").

For all these reasons, proposed Claims 7.B and 7.C are insubstantial.

4. Merits of Petitioner's *Brady* Claim

In Claim 4, Petitioner asserts that the State withheld the victims' U-visa information and a recording of Petitioner's conversation with Detective McCoy. (Doc. No. 4 at 10–11, 15). "*Brady* requires the prosecution to disclose all material exculpatory evidence to the defendant before trial." *Henness v. Bagley*, 644 F.3d 308, 324 (6th Cir. 2011) (discussing *Brady v. Maryland*, 373 U.S. 83 (1963)). "To demonstrate a *Brady* violation, a habeas petitioner must establish three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Brooks*, 626 F.3d at 890 (quoting *Strickler*, 527 U.S. at 281–82). Because the "cause and prejudice standard" of a procedural default analysis "tracks the last two elements of a *Brady* claim," it is sometimes appropriate to consider "the merits

50

of [a *Brady*] claim with the understanding that [a] decision on the merits resolves any issues as to procedural default." *Bell v. Bell*, 512 F.3d 223, 231 n.3 (6th Cir. 2008) (en banc)) (citing *Banks*, 540 U.S. at 691).

Petitioner attaches six documents in support of this claim to his Amended Motion for Expansion of Record. (Doc. No. 25 at 2–4). The Court considers these documents in its analysis. *See Apanovitch v. Houk*, 466 F.3d 460, 478 (6th Cir. 2006) (finding that a district court abused its discretion by denying a motion to expand the record to include documents relating to the prejudice element of a defaulted *Brady* claim). These documents do not include the allegedly suppressed evidence; rather, they appear to reflect an attempt to obtain the alleged evidence beginning around the conclusion of Petitioner's direct appeal proceedings.

According to these documents, in July 2015, Petitioner[21] requested information on the victims' citizenship status by submitting a Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS). (*See* Doc. No. 25-1 at 4 (Exhibit C)). In August 2015, DHS informed Petitioner that it could not conduct an adequate search of its records based on the information provided, and it advised Petitioner to submit a properly supported request for information to U.S. Citizenship & Immigration Services (USCIS). (*See id.* at 4–5). In May 2016, Petitioner submitted a FOIA request to USCIS. (*Id.* at 2–3 (Exhibit B)). In June 2016, USCIS denied the request. (*Id.* at 6–7 (Exhibit D)). At some point, meanwhile, Petitioner submitted a request to inspect public records regarding his criminal case to the Metropolitan Nashville Davidson County Emergency Communications Center (*see id.* at 10 (Exhibit F)), the MNPD Central Records Division (*see id.* at 11 (Exhibit G)), and the District Attorney's (DA) Office. (*See id.* at 8 (Exhibit E)). In response, the Emergency Communications Center stated that it no longer

---

[21] The Court regards Petitioner as the primary actor in these documents despite the documents' lack of clarity on whether actions were taken by Petitioner or someone acting on his behalf.

51

had records from the requested time period, the Central Records Division stated that it did not maintain records responsive to Petitioner's request, and the DA informed Petitioner of the procedure for inspecting his criminal file. (*Id.* at 8–11). Petitioner alleges that someone inspected the file on his behalf, but the U-visa information and recorded conversation that are the subject of Claim 4 were removed prior to inspection. (Doc. No. 25 at 2–3).

Even considering this expanded record, Petitioner has failed to establish a *Brady* violation.

### A. U-Visa Information

At a pre-trial hearing, the prosecutor stated that she would provide trial counsel copies of U-visa information filled out by the DA's Office. Assuming that she did not do so, and assuming that this failure constitutes either willful or inadvertent suppression, the Court can only speculate on what the U-visa information would have shown. Despite Petitioner presenting proof that he attempted to obtain this information, his allegations on the substance of the information are entirely conclusory. Perhaps U-visa information possessed by the State would have been consistent with the records offered by Shoney's counsel on the second day of trial that, at least according to Shoney's counsel and accepted as true by trial counsel, reflected the victims were in the country legally at the time of the offenses. Indeed, because trial counsel considered the issue moot after having an opportunity to review Shoney's records, that seems likely. But supposing that Petitioner's speculation is correct, and the U-visa information would have called into question the citizenship status of one or more of the victims, he still fails to show that it is impeaching, and that prejudice ensued.

Petitioner contends that the U-visa information would have impeached the victims' credibility by demonstrating that they were in the country illegally and motivated to lie about being victims of a serious crime in order to obtain lawful status. But the court had explicitly deferred

deciding whether trial counsel could pursue this line of questioning when trial counsel declared the issue moot. And in similar circumstances, the TCCA has approved limiting the cross-examination of an aggravated-robbery victim on his immigration status at trial, explaining: "Whether the victim was inside this country lawfully or unlawfully had no bearing on whether a crime occurred, whether the Defendant was involved in a crime, and whether the victim could identify the Defendant as one of the perpetrators." *State v. Taylor*, No. M2016-02578-CCA-R3-CD, 2018 WL 265512, at *8–12 (Tenn. Crim. App. Jan. 3, 2018) (citing *State v. Mark A. Crites*, No. M2014-00383-CCA-R3-CD, 2015 WL 3508042, at *8 (Tenn. Crim. App. June 4, 2015)). Therefore, Petitioner has not demonstrated that he could have used the alleged U-visa information to impeach the victims at trial.

Similarly, even if trial counsel had been permitted to question the victims on their immigration status, Petitioner has not shown prejudice. *Brady* prejudice "is a difficult test to meet." *Montgomery*, 654 F.3d at 678 (quoting *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002)). "To show cognizable prejudice, [the petitioner] must establish that the suppressed evidence is material—that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The Court answers this question by "review[ing] the evidence 'collectively, not item by item.'" *Brooks*, 626 F.3d at 890 (quoting *Kyles*, 514 U.S. at 436).

53

The victims gave detailed testimony about the incident that was corroborated by other evidence presented at trial, including Petitioner's statement to police. All three victims testified that the offenses were carried out by two men, one masked and one unmasked. *Teats I*, 2014 WL 98650, at *1–2. The victims testified that the masked man had a pistol, and that the victims were forced to move to a storage area and wait. *Id.* Their testimony was consistent with a 911 call admitted into evidence from a woman identified as Teresa,[22] who reported, "We just got robbed" and "they both had guns," and that the assailants put them in the stockroom. *See id.* at *1 n.2. Shoney's customer Jack Liev testified that, immediately following the incident, the manager pointed out an individual walking down the street as one of the perpetrators. *Id.* at *1. Liev watched the suspect, called 911, reported the robbery, and reported a suspect's description and location near the restaurant. *Id.* Police responded to a neighborhood across the street from Shoney's, and a resident reported that someone had gone into a crawl space. (Doc. No. 14-6 at 147, 152). Police ordered the occupant to come out, and Petitioner emerged from the crawl space. (*Id.* at 148–49, 153). Petitioner did not have a gun, but Detective McCoy found a handgun behind a bush nearby. (*Id.* at 149, 170). Petitioner subsequently gave a statement explaining that, a few days earlier, the accomplice convinced him to rob the Shoney's. *Teats II*, 468 S.W.3d at 499. Petitioner explained that, at Shoney's, he "demanded the money from the manager" while the accomplice "was 'securing' the other employees" in "the back of the store." *Teats I*, 2014 WL 98650, at *4. Petitioner admitted using a gun during the incident and throwing it behind bushes before hiding in the crawl space. *See id.* Additionally, across the street from Shoney's, police found Petitioner's

---

[22]     Teresa Diane Cline is named as the fourth especially aggravated kidnapping victim in the indictment. (Doc. No. 14-1 at 8). Both Ruiz and Moreno testified that another Shoney's employee named Teresa was present on the day of the incident. *See Teats I*, 2014 WL 98650, at *2. Teresa passed away before trial and thus did not testify. *See id.* at *2 n.3.

54

vehicle, which contained Petitioner's "wallet and a 'large black plastic garbage bag' full of loose bills and coins." *Teats II*, 468 S.W.3d at 498.

Considering all of this evidence, there is not a reasonable probability that the outcome of trial would have been different if Petitioner's attorneys used U-visa information to impeach the credibility of the victims based on their immigration status. Petitioner thus was not prejudiced by the alleged non-disclosure, and this aspect of his defaulted *Brady* claim is without merit.

### B. Recorded Conversation

Finally, Petitioner asserts that the State suppressed a recorded conversation between Petitioner and Detective McCoy. (Doc. No. 4 at 15). Although the original Petition does not specifically describe when this alleged conversation occurred, Petitioner's suppression hearing testimony is instructive. There, Petitioner testified that, after he emerged from the crawl space and police escorted him to the cruiser, Detective Stokes asked for help and information about other crimes but did not "go into it further until [they] went back to the station." (Doc. No. 14-4 at 109, 126–27). After being taken to the station and giving a statement about the Shoney's incident, Petitioner testified, he went to another room where Stokes told him that Stokes would not "put [him] away for the rest of [his] life if . . . [he] told [Stokes] this stuff" about other crimes. (*Id.* at 133–34). Stokes also told Petitioner that "he would only seek one charge against [Petitioner]" and talk to the DA about Petitioner's cooperation. (*Id.* at 134). In the room where Petitioner gave the separate statement about other crimes, he testified that there was a "lady detective," referring to Detective McCoy. (*Id.*). Petitioner testified that McCoy asked him about other crimes after Stokes' statements. (*Id.* at 135–36).

Petitioner contends that he would have used a recording of the separate statement to "prove a promise of leniency was in place," obtain suppression of the inculpatory statement introduced at

trial, and impeach Detectives Stokes and McCoy. (*See* Doc. No. 4 at 15). Petitioner fails to establish all three *Brady* elements for this claim. First, Petitioner has not shown that the conversation in question ever occurred, or if it did, that a recording exists. The burden is on a habeas petitioner "to prove that the evidence was not disclosed to him." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (citations omitted). Despite Petitioner's argument to the contrary, he has not carried that burden through his speculative assertion that someone must have removed the recording from his criminal file before it was inspected on his behalf. This aspect of Petitioner's *Brady* claim fails for this reason alone. *See Hendricks v. Lindamood*, No. 3:18-CV-00094-JRG-HBG, 2019 WL 5558571, at *7 (E.D. Tenn. Oct. 28, 2019) (citing *Coe*, 161 F.3d at 344) ("[Petitioner] has failed to include any challenged evidence as part of his petition, and therefore, he has failed to sustain his burden of proving that evidence was not properly disclosed to him.").

Second, Petitioner does not specifically explain how his attorneys could have used the recorded conversation to impeach Detectives Stokes and McCoy. McCoy did not testify at the suppression hearing, and her trial testimony was limited to describing her investigation of Petitioner's vehicle and the nearby area. (*See* Doc. No. 14-6 at 167–80). It is unclear how Petitioner could have used the alleged recording to impeach this testimony.

Stokes' testimony addressed Petitioner's statements, but it was not necessarily inconsistent with the alleged contents of Petitioner's separate statement at the station. Stokes admitted at the suppression hearing that Petitioner may have mentioned having information about other crimes at the police cruiser before being taken to the station. (*See* Doc. No. 14-4 at 96–97). He also acknowledged that he told Petitioner to help himself during questioning at the station. (*See id.* at 139). Stokes was more certain on these points at trial, testifying that, at the cruiser before being taken to the station, Petitioner asked if it would help to provide information on other crimes, and

Stokes responded, "yes[, he] would tell the DA that [Petitioner] cooperated." (Doc. No. 14-8 at 220). The jury heard audio of the subsequent inculpatory statement Petitioner gave at the station (*see* Doc. No. 14-7 at 47), during which Stokes told Petitioner to help himself by giving names of other people who were involved in planning the robbery. (*See* Doc. No. 14-13 at 153). Stokes testified that he told Petitioner to help himself because he "always inform[s] people that if they cooperate, [he is] more than happy to tell the DA that they cooperated." (Doc. No. 14-7 at 62). And the record reflects that, after Petitioner gave the inculpatory statement, Stokes charged Petitioner with one count of aggravated robbery. (*See id.* at 64–65 (Stokes' trial testimony that he charged Petitioner with just robbery); Doc. No. 15-2 at 46 (Petitioner's evidentiary hearing testimony that he was initially charged with just aggravated robbery before the DA obtained indictments for four additional counts of especially aggravated kidnapping)).

In short, Petitioner alleges that a recording of a separate statement he made about other crimes would have proven that Detective Stokes promised to tell the DA about Petitioner's cooperation and to seek one charge against Petitioner. Stokes' trial testimony reflects that he did just that. It is thus unclear how Petitioner could have used the alleged recording to impeach Stokes.

Third, Petitioner has not shown that any suppression of the alleged recording resulted in prejudice, either at the suppression hearing or at trial. As an initial matter, the alleged recording would not have altered the trial outcome because a promise of leniency for information about other crimes has no bearing on the evidence of Petitioner's guilt for the charged offenses.

As to the suppression hearing, Petitioner essentially argues that the alleged recording would have resulted in suppression of his inculpatory statement by providing evidence of police coercion. The Court assumes that *Brady* applies to Petitioner's suppression hearing. *See United States v. Taylor*, 471 F. App'x 499, 520 (6th Cir. 2012) ("[a]ssuming without deciding that *Brady* applies

57

to suppression hearings" but noting that "[t]he Sixth Circuit has never decided whether *Brady* protections are applicable to a suppression hearing"). "While it is true that in some situations, '[p]olice promises of leniency . . . can be objectively coercive,' generally, such promises are coercive only 'if they are broken or illusory.'" *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *United States v. Johnson*, 351 F.3d 254, 261–62 (6th Cir. 2003)). Moreover, a "promise to inform a prosecutor of cooperation" is not inherently coercive, "even when the promise . . . is accompanied by a promise to request leniency or by speculation that cooperation will have a positive effect." *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005) (internal citations and quotation marks omitted).

Here, Stokes' alleged promise to inform the DA of Petitioner's cooperation was not improper. And the record reflects that Stokes did not break his alleged promise to seek one charge against Petitioner. (*See* Doc. No. 14-7 at 64–65 (Stokes' trial testimony); Doc. No. 15-2 at 46 (Petitioner's evidentiary hearing testimony)). Petitioner therefore has not established that the alleged recording would have shown his inculpatory statement to be coerced, and there is not a reasonable probability that the outcome of the suppression hearing would have been different if the alleged recording had been disclosed. This aspect of Petitioner's defaulted *Brady* claim is without merit as well.

For all of these reasons, Claim 4 will be denied.

## V. REQUEST FOR EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing to obtain evidence in support of Claims 1.A, 2, 3, 4, and 6. (Doc. No. 4 at 2 (Claim 2); Doc. No. 28 at 1–6 (Claims 1.A, 3, 4, and 6)). He also contends that an evidentiary hearing "may be needed to show cause involving [p]ost-conviction

counsel's failure to properly argue and raise ineffective assistance of trial counsel claims." (Doc. No. 28 at 6). The Court concludes that an evidentiary hearing is not required.

As discussed above, Claims 1.A, 2, and 4 are procedurally defaulted without sufficient cause, and Claim 3 is not cognizable, so these claims do not entitle Petitioner to an evidentiary hearing. *See Cammuse v. Morgan*, 105 F. App'x 667, 670 n.4 (6th Cir. 2004) (declining to consider whether evidentiary hearing was required for habeas claim that was procedurally defaulted where petitioner had "not made a showing sufficient to excuse that default"); *Christian v. Hoffner*, No. 17-2105, 2018 WL 4489140, at *2 (6th Cir. May 8, 2018) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)) ("A district court is not required to hold an evidentiary hearing if the record 'precludes habeas relief.'"). Claim 6 was adjudicated on the merits in state court, so the Court is "obligated to decide the [claim] based solely on the state court record." *Sheldon v. Black*, No. 20-4156, 2021 WL 1654419, at *3 (6th Cir. Apr. 20, 2021) (citing *Pinholster*, 563 U.S. at 181–82). Post-conviction counsel's alleged failure to properly argue claims at the trial court level of post-conviction proceedings does not affect whether the claims were raised for *Martinez* purposes. *See Hugueley v. Mays*, 964 F.3d 489, 500 (6th Cir. 2020) ("Since a petitioner has no Sixth Amendment right to counsel in a post-conviction proceeding, it therefore follows that counsel cannot be ineffective for not taking all possible steps to fully develop the claim that the petitioner wishes she had."). And the ineffective-assistance claims that post-conviction counsel did *not* raise are not substantial, so they do not warrant an evidentiary hearing either. *See Christian*, 2018 WL 4489140, at *2 ("Because [the petitioner's] ineffective-assistance claims lacked merit, an evidentiary hearing was not required.").

For all of these reasons, Petitioner's Motion Requesting an Evidentiary Hearing (Doc. No. 28) will be **DENIED**.

## VI. REQUEST TO APPOINT COUNSEL

Petitioner asks the Court to appoint counsel to assist him in litigating Claims 1.A, 3, and 4. (*See* Doc. No. 27 at 1–4). Because this is a civil action, however, the appointment of counsel is not a constitutional right. *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003) (citing *Lavado v. Keohane*, 992 F.2d 601, 604-06 (6th Cir. 1993)). A district court is not required to appoint counsel for a habeas petitioner "unless counsel is 'necessary for effective discovery' or an evidentiary hearing is needed." *Scott v. Winn*, No. 18-1845, 2018 WL 5309805, at *1 (6th Cir. Oct. 22, 2018) (citing Habeas Rules 6(a) and 8(c)). Here, an evidentiary hearing is not needed, and Petitioner is not entitled to discovery. *See Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)) ("[A] court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'"); *Vizcaino-Ramos v. Lindamood*, No. 1:14-cv-1230-STA-egb, 2017 WL 5163588, at *4 (W.D. Tenn. Nov. 7, 2017) ("[I]f the claim is procedurally defaulted and the default is unexcused, discovery on the claim would be futile[.]").

Accordingly, Petitioner's Motion to Appoint Counsel (Doc. No. 27) will be **DENIED**.

## VII. CONCLUSION

For these reasons, Petitioner is not entitled to relief under Section 2254 and this action will be **DISMISSED**. Petitioner's motions to appoint counsel (Doc. No. 27), hold an evidentiary hearing (Doc. No. 28), and amend the Petition (Doc. No. 30) will be **DENIED**.

Because this is a "final order adverse to" Petitioner, the Court must grant or deny a certificate of appealability (COA). Habeas Rule 11(a). A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard

by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

For the reasons stated throughout the Court's analysis, the Court concludes that Petitioner has not satisfied these standards and will deny a COA.

An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE